47 A.3d 1051

**Princeton FEASTER**

v.

**STATE of Maryland.**

**No. 408, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

June 29, 2012.

Juan P. Reyes (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Sarah Page Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., HOTTEN, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), J.

In 1945 in *Animal Farm,* George Orwell told us, "All animals are equal, but some animals are more equal than others." A similar relativism prevails with respect to the protections of the Fourth Amendment. The people are protected from unreasonable searches and seizures, but probationers and parolees are less protected than other people. More precisely, searches that would be unreasonable with respect to other people would not be unreasonable with respect to them. The key to the puzzle now before us is that the appellant, when searched, was a parolee.

In *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), Chief Justice Rehnquist

wrote for a unanimous Supreme Court in describing the austerely reduced constitutional status under which one labors while on probation:

> Knights's status as a probationer subject to a search condition informs both sides of that balance. *"Probation, like incarceration, is 'a form of criminal sanction* imposed by a court upon an offender after verdict, finding, or plea of guilty.' " ... *Probation is "one point ... on a continuum of possible punishments* ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service."... *Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.' "*

(Emphasis supplied).

Five years later, *Samson v. California,* 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), confirmed that a convict placed on parole is situated even lower on the constitutional totem pole[1] than is a convict placed on probation:

> As we noted in *Knights, parolees are on the "continuum" of state-imposed punishments* .... On this continuum, *parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment* than probation is to imprisonment.... *"[P]arole is an established variation on imprisonment of convicted criminals* .... The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence." ... "In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements." ... *("[O]n the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.)"*

---

**1.** We apologize for indulging in the almost universal practice of turning the totem pole metaphor upside down. In actual Tlingit Indian culture, the place of honor is at the bottom of the pole and status diminishes progressively as one climbs upward.

(Emphasis supplied). As we analyze the search of a parolee in this case, we must not lose sight of the very different starting point for such analysis.

## The Case Now Before Us

The appellant, Princeton "Ditty" Feaster, was convicted in the Circuit Court for Wicomico Count by a jury, presided over by Judge D. William Simpson, of a variety of narcotics-related offenses. On this appeal, he raises the single contention that Judge W. Newton Jackson, III erroneously denied his pretrial motion to suppress physical evidence seized in alleged violation of the Fourth Amendment. The testimony from the suppression hearing tells the whole story.

## The Surveillance

On November 19, 2008, the Wicomico County Narcotics Task Force, a force comprised of members of the Maryland State Police and the Sheriff's Office of Wicomico County, was conducting a surveillance of the Days Inn, located at 2525 North Salisbury Boulevard in Salisbury. The task force had received numerous tips that drugs were being sold on the premises. In the course of that surveillance, Corporal Carlisle Widdowson spotted a suspected drug purchaser sitting in a vehicle on the Days Inn parking lot and attempting to inject heroin into his veins. Corporal Widdowson accosted the subject and questioned him about his source. The suspect stated that he had just purchased the drugs at the Days Inn from an individual he knew as "Ditty."

Corporal Widdowson was familiar with "Ditty" from previous encounters with him. A quick records check confirmed that "Ditty" was the nickname of the appellant, Princeton Gene Feaster. The records check also revealed that there was an outstanding arrest warrant for the appellant on a "parole retake." Corporal Widdowson obtained a photograph of the appellant from the police file and showed it to the management officials on duty at the Days Inn. Those officials confirmed that the appellant had been regularly around the Days Inn and was in and out of Room 133 specifically.

## Room 133

The motel officials produced for the police the actual rental agreement for Room 133, which showed that the room was rented to a white male by the name of Gary Dopowsky and was, moreover, rented by him through November 20, 2008. Surveillance was then maintained on Room 133 for approximately another hour. At that time, the surveillance team called in the assistance of the State Apprehension Team, informally known as "the warrant squad."

Sergeant John Maiello, along with other members of the Apprehension Team, approached Room 133. Through a window, they could see that the appellant was inside the room as its sole occupant. Sergeant Maiello announced his identity and stated that he was there to serve an arrest warrant on the appellant. The appellant adamantly refused to open the door. One of the officers went to obtain a room key from management as the other officers continued to knock on the door and the appellant continued to refuse to open it.

When the room key arrived, there ensued what Corporal Widdowson characterized as a "standoff." It was a routine worthy of a Marx Brothers comedy. With the key, one of the officers would unlock the door by turning the bolt. From the inside, the appellant would immediately relock the door. This back-and-forth thrust and counterthrust continued, according to the suppression hearing testimony, for no less than ten minutes. At last, the appellant submitted to the inevitable and the officers entered Room 133. The appellant, who had retreated to the back of the room, was immediately arrested and placed in handcuffs.

## The Entry

We can conveniently interrupt the factual narrative at this point for an interim legal analysis. In terms of Fourth Amendment reasonableness, there are in this case two distinct intrusions calling for assessment. There was first the entry into Room 133. There was subsequently the warrantless search of Room 133. We now know all we need to know to assess the entry. With respect to the entry itself, moreover, it

is easy and convenient to proceed immediately to the Fourth Amendment merits without pausing at the threshold to consider any questions about Fourth Amendment applicability.

The permissibility of entering even a presumptively protected place to serve an arrest warrant is clear, provided only that the police have reason to believe the person to be arrested is, indeed, within that place. *Payton v. New York*, 445 U.S. 573, 602–03, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) has been for 32 years the unchallenged touchstone:

> It is true that *an arrest warrant* requirement may afford less protection than a search warrant requirement, but it *will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen.* If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, *it is constitutionally reasonable to require him to open his doors to the officers of the law.* Thus, for Fourth Amendment purposes, *an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.*

(Emphasis supplied).

■ In this case, the police were executing a warrant for the appellant's arrest for a parole violation.[2] We have not, to be sure, been treated to much informative detail about the warrant, but neither have we been presented with any challenge to the warrant, with respect either to its existence or to its contents. All parties have been content simply to take this Fourth Amendment factor for granted. With respect to the other *Payton v. New York* requirement, moreover, there is no

---

**2.** That the Task Force members did not have the appellant's arrest warrant actually in hand is of no matter. Knowledge of its existence, through their dispatcher's record check, was sufficient. See *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971):

> Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.

(Emphasis supplied).

question but that the police had reason to believe that the appellant was in Room 133. Both the entry into Room 133 and the arrest of the appellant were reasonable within the contemplation of the Fourth Amendment.

## The Factual Narrative Resumes

Once the drawbridge was down, three officers rushed immediately into the breach. As Sergeant Maiello placed the appellant under arrest, the other two officers scanned the immediate area surrounding the appellant, to ensure that he could not grab a weapon that may have been accessible to him. In the course of "securing" the room, the officers looked into the two black bags on which the suppression hearing focused.

The first bag was sitting on top of the desk that was located right next to the entrance door to Room 133. That bag was approximately 16 feet away from where the appellant stood as he was being placed under arrest. It was a duffle-type bag. The second bag was on top of a bed and was approximately 7 feet away from where the appellant was being arrested. It was described as a laptop-type bag with a fold-over top. The testimony was that in that immediate scan for weapons, the police observed drugs within both bags.

The more thorough evidentiary search of the bags took place only after the appellant had been removed from the room. The bag on the bed contained a smaller blue Crown Royal bag containing 58.3 grams of heroin; two smaller bags containing 6.9 grams of heroin and 8.9 grams of heroin, respectively; zip-type baggies; stamp pads; wax baggies; wooden stamps; and pocket scales. In the bag that was next to the door were several bundles of baggies of heroin containing a total of 29.5 grams of heroin and several wax baggies containing heroin. Also recovered from the room were two separate stacks of money located on a table, along with another stack of money and two cell phones that were hidden between the bed and the box spring.

Those two bags have produced a plethora of Fourth Amendment theories, some of which were argued and two of which were strangely ignored.

## A Doctrinal Cul–De–Sac: Abandonment

At the suppression hearing, the State flirted briefly with the theme of abandonment, but the flirtation went nowhere. Corporal Widdowson testified that he had been told by the management of the Days Inn that because the appellant had been arrested, Room 133 would be cleared and its contents would be discarded. He testified that in view of that announced intention, he considered those items of property to be legally abandoned. Had that discarding by the Days Inn actually been carried out, the proprietary rights of Gary Dopowsky, who had rented Room 133 through the following day, would seem thereby have been cavalierly disdained.[3] Had the Days Inn, without a hint of involvement by way of State action, actually carried out such a plan and had the task force then simply rummaged through the abandoned trash, the Fourth Amendment implications of such a scenario will have to be explored in some other opinion in some other case. In this case, the abandonment rationale never got off the ground. There is, of course, no Fourth Amendment theory that permits the police to treat as abandoned property items that have not yet been abandoned but which might at some future time become abandoned. As Judge Jackson quickly concluded:

> I don't even believe the State's claiming it's abandoned property. I agree with the defense that this is probably not inevitable discovery.

## An Opportunity Foregone: Challenging the Appellant's Standing

■ There was another rationale that would have gotten off the ground. Inexplicably, the State never challenged the ap-

---

**3.** It is inconceivable that the motel management was actually planning to throw three stacks of cash into the trash. To enjoy a criminal trial transcript, however, is necessarily to agree with Samuel Taylor Coleridge that "a necessary condition for the enjoyment of any fiction is the willing suspension of disbelief."

pellant's Fourth Amendment standing to object to the police entry into or the search of Room 133. Why the appellant was in the room remains to this day a mystery. The room was rented to Gary Dopowsky, with no indication that that was an alias of the appellant. The appellant actually testified that it was Gary Dopowsky who had rented the room. Even with no demonstrated propriety interest in Room 133, however, the appellant might still have enjoyed derivative standing, had he shown that he was a legitimate guest in the room at the invitation of Gary Dopowsky. *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). In such a case, the Fourth Amendment protection enjoyed by the host would extend derivatively to a guest who is legitimately on the premises at the invitation of the host. Even being the legitimate guest of Gary Dopowsky, however, would have yielded the appellant no Fourth Amendment protection in terms of derivative standing if it had also been shown, as it clearly was in this case, that the appellant was in someone else's home, apartment, or motel room for the criminal purpose of packaging and selling narcotic drugs. *See Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998):

> *Respondents here* were obviously not overnight guests, but *were essentially present for a business transaction* ... There is no suggestion that they had a previous relationship with [their host], or that there was any other purpose to their visit. *Nor was there anything similar to the overnight guest relationship* in [*Minnesota v.*] *Olson to suggest a degree of acceptance into the household.* While *the apartment was* a dwelling place for [the host], it was *for these respondents simply a place to do business.*
>
> Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property.

(Emphasis supplied).

This case would have presented no Fourth Amendment problem if the appellant, who, if challenged, would have borne

the burden of proof on standing, *Rakas v. Illinois,* 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *Fitzgerald v. State,* 153 Md.App. 601, 662, 837 A.2d 989 (2003), *aff'd.* 384 Md. 484, 864 A.2d 1006 (2004); *Burks v. State,* 96 Md.App. 173, 195, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993), had not been able to show a Fourth Amendment interest in Room 133. Such a threshold challenge, it would seem, ought to be an automatic prosecutorial instinct when dealing with hotels and motels.

█ There is no point in locking the barn door, however, once the horse is out. A failure of the State to raise a challenge to a defendant's standing at the suppression hearing operates as a waiver of the challenge. As Judge Salmon wrote for this Court in *McGurk v. State,* 201 Md.App. 23, 33, 28 A.3d 720 (2011):

> We hold that by failing to raise the standing issue in the circuit court, the State waived that issue for appellate purposes.

In *McCain v. State,* 194 Md.App. 252, 279, 4 A.3d 53 (2010), Judge Kehoe held to a similar effect:

> Because the State did not raise the issue at the suppression hearing, there was no reason for appellant to present such evidence and he did not. Under these circumstances, consideration of the standing issue for the first time on appeal would be unfair to appellant.

The easy disposition of the case is thus not available to us. We will have to take the long way around. In going forward with our Fourth Amendment analysis, we will treat the appellant, therefore, as if he had rented Room 133 in his own name and for his own use. Verily, we will treat him as if he were the fee-simple owner of the Days Inn itself.

### The Diminished Fourth Amendment Protection Of a Parolee

Even with enhanced Fourth Amendment credentials, however, the appellant's case for the suppression of the evidence founders. His Fourth Amendment credentials that may have

been enhanced by his presumptive standing were drastically devalued in another respect. The ultimately dispositive factor is that there was an outstanding parole retake warrant for the arrest of the appellant. The appellant had been convicted on July 15, 2004, in the Circuit Court for Somerset County for the possession with intent to distribute controlled dangerous substances. He was sentenced to a term of seven years, with all but three years suspended to be followed by two years of probation upon release. On August 1, 2006, the appellant was placed on parole. The record seems to indicate that as of August 1, 2006, the appellant was on both probation and parole. In any event, on March 16, 2008, the appellant was charged with a subsequent offense and on March 20, 2008, a parole retake warrant was issued for his arrest. That parole retake warrant was still outstanding, when the current offense took place eight months later.

As we have already discussed, and held, the arrest of the appellant on the outstanding parole retake warrant passed Fourth Amendment muster and is beyond challenge. By the same token, the police entry into Room 133 for the purpose of making that arrest also passed Fourth Amendment muster and is also beyond challenge. The challenge is to the search of (by initially looking into) and to the seizure of narcotics from two bags that were in Room 133.

Even granting the appellant presumptive derivative standing in Room 133 itself, attention then devolves upon the extent of any Fourth Amendment protection that the appellant, because of his special status as a parolee, may have enjoyed with respect to a search of his person (including his extended person in the search incident context) or of the motel room. 5 Wayne R. LaFave, *Search and Seizure* (4th ed.2004), § 10.10, "Searches Directed at Parolees and Probationers," p. 432, makes very clear the severely diminished expectation of privacy suffered by those convicted of a crime even when conditionally released on probation or parole:

Although there is some authority to the effect that the Fourth Amendment rights of probationers and parolees are of precisely the same scope and dimension as those of the

public at large, the weight of authority is to the contrary. *As to parolees,* it has been held with some frequency that *their residence may be searched without a warrant or even without probable cause,* that *their vehicles may be searched without either probable cause or a warrant,* and also that they may be subjected to arrest without probable cause. And while there is some disagreement as to whether a probationer's Fourth Amendment rights are diminished to the same extent and degree as those of a parolee, there is considerable authority supporting the proposition that *probationers may lawfully be subjected to searches which, absent their probation status, would be deemed unlawful because of the absence of probable cause or a search warrant or both.*

(Emphasis supplied).

This body of law recognizing the austerely diminished Fourth Amendment protection enjoyed by a probationer or a parolee is of relatively recent origin. It effectively began with the unanimous Supreme Court opinion in *United States v. Knights, supra,* in 2001. The defendant in *Knights* had been placed on probation for a drug offense. Subsequently developing reasonable suspicion that he was involved in a series of arsons, the police conducted a warrantless search of Knight's apartment and recovered evidence of arson. The Supreme Court rejected the defense argument that the only warrantless searches sanctioned by *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), were those directed at discovering a violation of probation and not those that were investigating crime more generally. The Supreme Court in *Knights* opted for a general reasonableness balancing test under the totality of the circumstances. The Supreme Court did not base its decision on the fact that Knights, in agreeing to probation, had accepted the condition that he be searched. That was simply one factor in the larger totality.

We need not decide whether Knights's acceptance of the search condition constituted consent in the *Schneckloth* sense of a complete waiver of his Fourth Amendment rights, however, because we conclude that the *search of Knights*

*was reasonable under our general Fourth Amendment ap-*
*proach of "examining the totality of the circumstances,"*
with the probation search condition being a salient circum-
stance.

534 U.S. at 118, 122 S.Ct. 587 (emphasis supplied).

The balancing was between the governmental interest being
served by the search and the privacy interest in avoiding the
search. Chief Justice Rehnquist's opinion for the Court was
that the defendant's status as a probationer "informs both
sides of that balance." 534 U.S. at 119, 122 S.Ct. 587. The
opinion made clear why there is a greater governmental
interest in regulating convicted criminals, even if they are on
probation, than there is in regulating ordinary citizens.

In assessing the governmental interest side of the bal-
ance, it must be remembered that *"the very assumption of*
*the institution of probation" is that the probationer "is*
*more likely than the ordinary citizen to violate the law."*
*The recidivism rate of probationers is significantly higher*
*than the general crime rate ... [P]robationers have even*
*more of an incentive to conceal their criminal activities*
*and quickly dispose of incriminating evidence than the*
*ordinary criminal* because probationers are aware that
they may be subject to supervision and face revocation of
probation, and possible incarceration, in proceedings in
which the trial rights of a jury and proof beyond a reason-
able doubt, among other things, do not apply.

534 U.S. at 120, 122 S.Ct. 587 (emphasis supplied).

The Court's ultimate balancing made it clear that law
enforcement may focus on probationers "in a way that it does
not on the ordinary citizen":

The State has a dual concern with a probationer. On the
one hand is the hope that he will successfully complete
probation and be integrated back into the community. On
the other is *the concern,* quite justified, *that he will be more*
*likely to engage in criminal conduct than an ordinary*
*member of the community.* The view of the Court of
Appeals in this case would require the State to shut its eyes

to the latter concern and concentrate only on the former. But we hold that *the Fourth Amendment does not put the State to such a choice ... Its interest in apprehending violators of the criminal law,* thereby protecting potential victims of criminal enterprise, *may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.*

534 U.S. at 120–21, 122 S.Ct. 587 (emphasis supplied).

 The watered-down requirement for justifying a reasonable Fourth Amendment search of the home of a probationer is not a search warrant nor even probable cause. It is simply a reasonable suspicion that evidence of a crime will be found.

*Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause,"* a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable ... *Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer* subject to a search condition *is engaged in criminal activity,* there is enough likelihood that criminal conduct is occurring that *an intrusion on the probationer's significantly diminished privacy interests is reasonable.*

*The same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary.*

534 U.S. at 121, 122 S.Ct. 587 (emphasis supplied).

Contrary to the argument that has been advanced by the appellant, the police would not have needed a warrant to search Room 133 for weapons or for drugs, even if no search incident to lawful arrest had been involved. Nor would the police have needed so much as probable cause. What they had was reasonable suspicion galore that the parolee was "engaged in criminal activity" and nothing more than that was required. The task force had received numerous tips that drugs were being sold and that the Days Inn was the epicen-

ter of the enterprise. As one recent customer was apprehended while trying to "shoot up" heroin, he pointed the accusing finger at "Ditty" and, ultimately, at Room 133. That, *ipso facto*, was reasonable suspicion. Indeed, we would not hesitate to quantify the suspicion as rising to the probable cause level, if such were needed. It is not.

*United States v. Knights,* however, was but the first shoe to drop on those who are only conditionally released. *Samson v. California, supra,* dropped five years later with even more resounding a thud. Samson was on state parole in California. A local police officer, recognizing him and suspecting that there might be an outstanding warrant on him, detained Samson and made a radio check of his status. The officer learned that there was no outstanding warrant but searched Samson nonetheless, with no special justification for the search. The search produced a plastic baggie of methamphetamine.

■ The *Samson* opinion made clear at the outset that in the *Knights–Samson* jurisprudence, both probationers and parolees share the status of persons who have been convicted of a crime but who are on conditional release from prison. To the extent to which there is an internal pecking order, the parolee stands even below the probationer.

> [P]arolees have fewer expectations of privacy than proba-
> tioners, because *parole is more akin to imprisonment* . . .
> On the Court's continuum of possible punishments, parole is
> the stronger medicine; ergo, *parolees enjoy even less of the
> average citizen's absolute liberty than do probationers.*

547 U.S. at 850, 126 S.Ct. 2193 (emphasis supplied).

The *Samson* opinion then took a giant step beyond anything that *Knights* had done. In dealing with the diminished Fourth Amendment status of convicted persons placed on conditional release, *Knights* had lowered the bar for the reasonableness of searching such persons, or their homes or their automobiles, etc., for evidence of criminality. A search warrant was not required. Even probable cause in the absence of a search warrant was not required. *Knights,* did,

however, insist upon some level of Fourth Amendment justification. *Knights* demanded reasonable (*Terry*[4]-level) suspicion that the probationer was involved in some criminal activity. *Knights* did not deal with the question of whether probationers or parolees could reasonably be subjected to a suspicionless search. *Samson* addressed the theretofore unanswered question and held that they could:

> We granted certiorari to answer a variation of the question this Court left open in *United States v. Knights—whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search* by a law enforcement officer *would not offend the Fourth Amendment.* Answering that question in the affirmative today, we affirm the judgment of the California Court of Appeal.

547 U.S. at 847, 126 S.Ct. 2193 (emphasis supplied).

In focusing on what we will call the *Samson* increment—the suspicionless search—the Supreme Court relied heavily on the fact that parolees in California expressly agree to the condition that they and their property may be searched at any time without any particularized justification. Whereas the search of a probationer authorized by *Knights* was based upon the probationary statute plus reasonable suspicion, the *Samson* increment of a suspicionless search would have to be justified exclusively by the condition that the parolee had agreed to such a search:

> Balancing these interests, we held that *"[w]hen an officer has reasonable suspicion that a probationer* subject to a search condition is *engaged in criminal activity,* there is enough likelihood that criminal conduct is occurring that *an intrusion on the probationer's significantly diminished privacy interests is reasonable."* Because *the search* at issue *in Knights was predicated on both the probation search condition and reasonable suspicion,* we did not reach the question whether the search would have been reasonable

---

4. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

under the Fourth Amendment had it been solely predicated upon the condition of probation. Our attention is directed to that question today, albeit in the context of a parolee search.

547 U.S. at 849–50, 126 S.Ct. 2193 (emphasis supplied).

In holding that the suspicionless search is not, *ipso facto*, unconstitutional, the Supreme Court relied on the balancing test of *Knights:*

> *Parolees may also be subject to special conditions,* including psychiatric treatment programs, mandatory abstinence from alcohol, residence approval, and "[a]ny other condition deemed necessary by the Board [of Parole Hearings] or the Department [of Corrections and Rehabilitation] due to unusual circumstances." *The extent and reach of these conditions clearly demonstrate that parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone.*

547 U.S. at 852, 126 S.Ct. 2193 (emphasis supplied).

Although in the *Samson* case itself, agreeing to accept a suspicionless search was made a condition of parole by California statute, the trimmed down constitutional holding is that a suspicionless search of a parolee does not in and of itself offend the Fourth Amendment:

> As the recidivism rate demonstrates, most parolees are ill prepared to handle the pressures of reintegration. Thus, *most parolees require intense supervision.* The California Legislature has concluded that, given the number of inmates the State paroles and its high recidivism rate, *a requirement that searches be based on individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders. This conclusion makes eminent sense.* Imposing a reasonable suspicion requirement, as urged by petitioner, would give parolees greater opportunity to anticipate searches and conceal criminality.

547 U.S. at 854, 126 S.Ct. 2193 (emphasis supplied).

In *King v. State,* 425 Md. 550, 42 A.3d 549 (2012), the Court of Appeals relied upon the *Knights–Samson* line of cases in

distinguishing between the normal Fourth Amendment rights enjoyed by those who have not been convicted of a crime and the significantly diminished Fourth Amendment rights of those who have been convicted, even if they are out of prison on conditioned release. With respect to the normal expectation of privacy enjoyed by one who has not been convicted, Judge Harrell's majority opinion observed:

[W]e evaluate here rights given to, and withdrawn from, citizens who have been arrested, including the right to be free from unreasonable searches and seizures. Under the totality of the circumstances balancing test, see *Knights [United States ] v. United States [Knights ]*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d [497] (2001), we conclude, on the facts of this case, that *King, who was arrested, but not convicted,* at the time of his first compelled DNA collection, generally *has a sufficiently weighty and reasonable expectation of privacy* against warrantless, suspicionless searches *that is not outweighed by the State's purported interest in assuring proper identification of him* as to the crimes for which he was charged at the time.

*Id.*, at 555–56, 42 A.3d 549 (emphasis supplied).

Conversely, with respect to the lesser expectation of privacy possessed by probationers and parolees, the Court of Appeals also observed:

The Supreme Court deployed later the *Knights "totality of the circumstances" test to determine whether a suspicionless search of a parolee,* conducted by a police officer on a public sidewalk, *was reasonable under the Fourth Amendment. Samson v. California,* 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). The Court concluded that, on the continuum of punishments imposed for criminal violations, a *parolee has "fewer expectations of privacy than probationers,* because parole is more akin to imprisonment than probation...." *Samson,* 547 U.S. at 850, 126 S.Ct. at 2198, 165 L.Ed.2d at 258. *Parolees are subject to a wide range of conditions for their release,* including mandatory drug tests, restrictions on personal associations and activities, psychiatric treatment, residence approval, and mandatory meetings

with parole agents. *Samson*, 547 U.S. at 851, 126 S.Ct. at 2199, 165 L.Ed.2d at 259. As in *Knights, Samson* focused heavily on the high recidivism rate of the parolee population, which, in California during the relevant time, approached 70 percent. *Samson*, 547 U.S. at 853, 126 S.Ct. at 2199, 165 L.Ed.2d at 259. *The Court concluded that the government interest* in re-integrating parolees, protecting society from future criminal actions, along with a statutory prohibition against "arbitrary, capricious, or harassing" searches, *outweighed the parolee's diminished expectation of privacy* under the "totality of the circumstances." *Samson*, 547 U.S. at 856, 126 S.Ct. at 2202, 165 L.Ed.2d at 262.

*Id.*, at 564–65, 42 A.3d 549 (emphasis supplied).

In the case before us, of course, we have no occasion to deal with the *Samson* increment. There was no suspicionless search in the case.[5] When the police entered Room 133 of the Days Inn, they were possessed, at the very least, of abundant reasonable suspicion that the appellant was engaged in criminal activity. Even granting him presumptive Fourth Amendment standing in Room 133, reasonable suspicion abounded that he was engaging in criminal activity. The search of Room 133 needed no further justification.

But for the fact that the defendant was on probation rather than parole, the case of *United States v. Graham*, 553 F.3d 6 (1st Cir.2009), is virtually a clone of the case now before us. Following his convictions for various drug-related offenses, Graham was released on probation. A warrant was subsequently issued for his arrest for violating his probation. In executing that warrant, the police entered Graham's apartment. After arresting him, the police searched his bedroom and recovered a sawed-off shotgun and ammunition. Gra-

---

5. If a suspicionless search pursuant to *Samson* were before the Court and the State were urging, as it would have to do, reliance on an agreed-to condition of parole, it would be incumbent on the State to introduce at the suppression hearing a copy of the parole agreement or some other evidence of its content.

ham's claim in that case closely paralleled the appellant's claim in this case:

> Graham argues that both the officers' entry into the apartment and the subsequent search of the bedroom where he was arrested violated the Fourth Amendment. *He claims that because he was a social guest in the apartment, the police needed to first obtain a search warrant to enter the apartment,* in addition to the arrest warrant they had procured. Additionally, *he argues that even if the arrest warrant justified the entry into the apartment, the police still needed a search warrant to conduct the search of the bedroom.*

553 F.3d at 9 (emphasis supplied).

Graham had actually been arrested, handcuffed, and removed to another room before the critical search of his bedroom took place:

> *The officers arrested Graham, handcuffed him, and brought him to the living room,* which was in the front of the apartment ... *The probation officer asked the officers to search the bedroom* where Graham was found. In the course of this search, the police found a sawed off shotgun and ammunition in the drawer of a dresser. The officers also discovered a small safe underneath the bed. Using a knife, an officer opened the safe and discovered various types of ammunition.

553 F.3d at 11 (emphasis supplied).

The First Circuit held that the search of the apartment of the probationer was constitutional based upon reasonable suspicion:

> *Typically,* to be considered reasonable a *search of a home must be supported by probable cause and be executed pursuant to a particularized warrant* authorizing the search ... However, *there are exceptions to the probable cause and warrant requirements,* as the reasonableness of any search is ultimately determined by *examining the "totality of the circumstances" and balancing* on one hand *"the degree to which [the search] intrudes upon an individual's*

*privacy" and* on the other *"the degree to which [the search] is needed for the promotion of legitimate government interests." Knights,* 534 U.S. at 118–19, 122 S.Ct. 587.

Where a *defendant on probation* is challenging a probation search, *that fact significantly influences the required balancing.* As a conditional releasee, *a probationer has a substantially diminished expectation of privacy.*

553 F.3d at 15 (emphasis supplied).

In *United States v. Yuknavich,* 419 F.3d 1302 (11th Cir. 2005), the defendant whose computer was warrantlessly searched was also a probationer. The opinion of the 11th Circuit Court of Appeals, 419 F.3d at 1311, made it clear that the key criterion for the *Knights* balancing test is reasonable suspicion and that the absence of an express search condition is not fatal to the search of the probationer's property:

In sum, assuming *the lack of a search condition* heightened Yuknavich's expectation of privacy, it *did not sway the Knights balancing test such that the probation officers needed more than reasonable suspicion to conduct a search of Yuknavich's computer.*

. . . .

*Despite the absence of a state regulation or search condition* requiring Yuknavich to submit to warrantless searches, *he had a greatly reduced expectation of privacy* in his computer. Under the *Knights* balancing test, *the probation officers needed no more than reasonable suspicion* of a probation violation *to conduct a search of his computer.* Because *the search was supported by reasonable suspicion,* Yuknavich's motion to suppress was properly denied.

(Emphasis supplied). See also *United States v. Taylor,* 482 F.3d 315, 318–19 (5th Cir.2007) ("[T]he police had reasonable suspicion that Taylor may have been engaged in criminal conduct."); *United States v. Herndon,* 501 F.3d 683, 688 (6th Cir.2007) ("[R]easonable suspicion was sufficient to conduct a search of a probationer's home.").

■ In light of the appellant's status not simply as a parolee generally but as a parolee for whom a parole retake

arrest warrant was outstanding, we hold, pursuant to the balancing test of *United States v. Knights*, that the search of Room 133 of the Days Inn, based on reasonable suspicion to believe that the appellant was engaged in criminal activity, was not unreasonable under the Fourth Amendment. Judge Jackson was not in error in denying the appellant's motion to suppress the fruits of that search.

## An Alternative Holding: A Search Incident To Lawful Arrest

Because both the appellant and the State argued the Fourth Amendment issue at the suppression hearing essentially in terms of whether the initial police look into two bags was within the reasonable scope of a search incident to lawful arrest, it behooves us to address the subject. As an alternative reason for affirming the ruling of the suppression hearing and the ultimate verdict of the trial court, we hold that, even assuming *arguendo* that the appellant enjoyed the full panoply of Fourth Amendment protections possessed by those who had not been convicted and were not on parole, the initial examination of the two bags was within the permissible scope of a search incident to lawful arrest. It is appropriate, in our own judgment, that we work our way through to that conclusion step by step.

### A. Twin Problems of Initial Intrusion and Scope

To pass Fourth Amendment muster, every search has two obstacles to overcome. There is first the problem of justifying the initial intrusion. There is then the distinct problem of determining the permissible scope of even a validly initiated intrusion. *Coolidge v. New Hampshire*, 403 U.S. 443, 467–68, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The warrant clause of the Fourth Amendment itself is a classic illustration of the dichotomy between intrusion and scope. The first two requirements—1) that the warrant be based "upon probable cause" and 2) that the probable cause be "supported by oath or affirmation"—are part of the justification for the initial intrusion. The third requirement—"particularly describing

the place to be searched and the persons or things to be seized"—then circumscribes the scope of what may be done pursuant to that warrant, even granting that it was properly issued. The purpose of the particularity clause and of scope limitations generally is to make certain that even a search that begins reasonably does not degenerate into a fishing expedition or a general "rummaging about."

 The very name of the search incident exception to the warrant requirement—search incident to lawful arrest—spells out the required justification for the initial intrusion. It is the fact of a lawful arrest. There is no such animal as a reasonable search incident to an unlawful arrest. There is no such animal as a reasonable search incident to a non-arrest. Given, however, the predicate of a lawful arrest, the police prerogative of a search incident to that arrest will automatically follow, with nothing further being required to be shown. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). The only nuanced wrinkle added to the justification requirement over the years is that the arrest must be a custodial arrest. *Knowles v. Iowa*, 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998).

With respect to a search incident to lawful arrest, the scope problem itself is twofold. There is the problem of how intensive in scope a search incident may be. There is the distinct problem of how extensive in scope a search incident may be. In terms of how intensive a search incident may be, *United States v. Robinson, supra,* and *Gustafson v. Florida, supra,* made it clear that because a search incident is aimed at two exigencies—it focuses on evidence as well as on weapons—it may be more intensive (it may go into pockets, e.g.) than the *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), frisk for weapons, which is focused only on weapons and is restricted, therefore, to a "pat-down" of the exterior of the clothing surface. The latter-day problem of strip-searches is also an aspect of how intensive a search incident may be. The nagging problem over the decades with search

incident law, however, has been that of how extensive in scope it may be.

## B. Geographic Scope of a Search Incident

The overwhelming majority of the problems afflicting the search incident exception over the years involved the mapping out its proper range in space. For 42 years—from 1927 to 1969—the Supreme Court wrestled with that spatial problem. The great search incident "geography battle" was ultimately resolved by *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). We cannot begin to analyze intelligently what happened in Room 133 of the Days Inn in Salisbury, Maryland without a full understanding of *Chimel v. California* at its very core. To analyze a problem involving the *Chimel* perimeter, which is what we have before us, we have to understand where the *Chimel* perimeter came from and what it was intended to do.

There was, as we have already fully articulated, a lawful arrest of the appellant. As an automatic consequence of that arrest, the arresting officers had the prerogative of conducting a search as an incident of that arrest. What, however, was the geography of that prerogative? What was its range in space? Where between the central axis of the appellant's spine and the planet Venus did that prerogative run out? What, moreover, are the principles that explain why that prerogative at a certain point had to run out and that enable us to locate the demarcation point, perhaps in some turbulent and chaotic setting, between those search-incidents that are still in bounds and other search-incidents that are definitely off-limits.

The Supreme Court first addressed the problem of the search incident's range in space in 1927 in *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). Over the course of the next 42 years, the Court reversed its field five times, producing six different and widely varying answers to the geographic scope problem. Three times—in the *Marron* case, in *Harris v. United States,* 331 U.S. 145, 67 S.Ct.

1098, 91 L.Ed. 1399 (1947); and in *United States v. Rabinow-itz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950)—it defined the permissible search incident perimeter as the entire premises in which the arrest was made, from the top of the roof to the sub-basement and all points in between. Alternating with those broad scope phases were two austerely limited narrow scope phases, confining the search-incident tightly to the arrestee's body, in *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931), and *Trupiano v. United States*, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948). An intelligent resolution was not reached until *Chimel* in 1969.[6] It is that resolution that needs to be fully understood and applied to Room 133.

## C. The *Chimel* Perimeter

Justice Potter Stewart authored the Supreme Court's majority opinion in *Chimel*. He gave full credit, however, to the heavy intellectual lifting that had been done by Justice Felix Frankfurter in a trilogy of principled dissents—in *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); in *Harris, supra* in 1947; and in *Rabinowitz, supra* in 1950. The Frankfurter dissents illustrated the truism that true legal skill consists not of getting the right answer but of asking the right question. Once the precisely apt question is posed, the answer has a way of jumping right up off the page. Frankfurter asked the right question of search incident law.

By way of posing the right question, what Frankfurter said to his colleagues was, in effect, this: "We have been trying to figure out what should be the scope of a search incident to arrest. That's easy. The permitted scope of any search is whatever is necessary to serve the purpose of that search—but not one little bit more. If we want to figure out the scope of a search incident, therefore, we must ask what is the

---

6. For a fuller account of this chapter in constitutional history, see Moylan, "The Plain View Doctrine: Unexpected Child of the Great 'Search Incident' Geography Battle," 26 Mercer L.Rev. 1047 (1975).

purpose of a search incident? The scope will be whatever is necessary to serve that purpose."

By way then of an answer, the twin purposes of a search incident to arrest had been articulately set forth by then-Judge Benjamin Nathan Cardozo for the Court of Appeals of New York in *People v. Chiagles,* 237 N.Y. 193, 196, 142 N.E. 583 (1923). The twin exigencies are 1) the possible destruction of accessible evidence by the arrestee (by way of swallowing a lottery slip, flushing heroin down a toilet, e.g.) and 2) the possible use of a weapon to harm the arresting officer or others. Reasoning from the service of those purposes, it followed, said Frankfurter and ultimately *Chimel,* that the prerogative should not be tied tightly to the body of the arrestee, because the arrestee could reach for a nearby lottery slip and swallow it even if it was not on his body or lunge for a nearby weapon to harm the officer even if the weapon were not on his body. The search perimeter, therefore, had to be pushed out to include a penumbral danger zone. It had to embrace what Frankfurter denominated "that area that may fairly be deemed an extension of the body." On the other hand, the response to those exigencies would not justify expanding the search zone into the more far-flung extremities of the premises.

Proceeding directly from that logic, *Chimel* described the search incident zone as the area within the "reach, lunge or grasp" of the arrestee. It may also be thought of as the "wingspan" or "wingspread" of the arrestee. More and more these days, we use, as convenient shorthand, the *"Chimel* perimeter." All of these terms mean exactly the same thing. They describe the area in which the arrestee **MIGHT** be able to do either of the two bad things that the search incident exception was designed to prevent him from doing. That danger zone is *per se* the zone within which the police are permitted, nay encouraged, to take all necessary preemptive or preventive measures.

With respect to this search-generating exigency universally attendant on a custodial arrest, moreover, it is an exigency

that does not have to be factually established on a case-by-case basis. It is automatically and irrebuttably presumed as a matter of law. It is a classic bright line formula. *United States v. Robinson*, 414 U.S. at 235, 94 S.Ct. 467, *Gustafson v. Florida*, 414 U.S. at 265–66, 94 S.Ct. 488.

### D. Reducing the Clutter

In narrowing our focus onto this appellant's *Chimel* perimeter as of November 19, 2008, it will be helpful to tune out some distracting static. In the appellant's initial brief and in his reply brief, the *Chimel* perimeter problem is argued as if *Chimel* had been significantly modified by *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). The State has felt compelled, at least conditionally, to respond in kind.

*Arizona v. Gant*, however, has absolutely nothing to do with this case. It has nothing to do, moreover, with search incident law or with the *Chimel* perimeter generally. The entire line of cases—beginning with *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), moving on to *Thornton v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004), and culminating in *Arizona v. Gant*—dealt exclusively with the narrow problem of how to apply the *Chimel* perimeter to the passenger compartment of an automobile. This line of cases never presumed to deal more broadly with anything else.

The issue of how to superimpose the *Chimel* perimeter on the interior of an automobile first arose in *New York v. Belton.* The problem was how to measure the permissible scope of a search incident when the arrestee was, as driver or passenger, still sitting in the vehicle or standing just outside the vehicle when the arrest occurred. The Supreme Court recognized the tangled complexities of calibrating someone's reach, lunge, or grasp in and out of a glove compartment, under the front seat, down between the seats, onto the back seat, onto the floor of the rear seat, into the window buckets, etc. Is the back window ledge of a small Volkswagen, for instance, within the

wingspan of a driver with long, long arms, but the back window ledge of a big Lincoln town car beyond the wingspread of a driver with short, short arms? If more than one arrestee were in or near the car, moreover, multiple *Chimel* perimeters might overlap.

*New York v. Belton* responded to such potential trivializing with a "bright line formula." As an easily administered and standardized test, the passenger compartment, as an indivisible unit, would either be all in the *Chimel* perimeter or all outside of it. Even if the arrestee were standing outside the car, if his actual *Chimel* perimeter touched any part of the passenger compartment, then the entire passenger compartment would arbitrarily be deemed to be within his *Chimel* perimeter. Even if not always true, it is true most of the time, and that is all that is required to justify a "bright line formula." That is what most of the world understood to be the holding of *New York v. Belton* and that is what *Arizona v. Gant* confirmed as still being the case.

To the extent to which *Arizona v. Gant* effected a correction of course, it was not with respect to a proper reading of *New York v. Belton.* It was with respect to an errant application of *New York v. Belton* by *Thornton v. United States* in 2004. In a questionable analysis that seemed to smack more of probable cause and *Carroll* doctrine considerations than it did of the exigencies that are incident to arrest, *Thornton* seemed to put its imprimatur on the search of the passenger compartment that might once have been within the suspect's *Chimel* perimeter but no longer was so at the actual time of the search. When the search of the passenger compartment in that case took place, Thornton was already in handcuffs and sitting in a police car.

It was *Thornton's* interpretation of *Belton* that needed correction and that is what *Arizona v. Gant* did. In *Thornton,* the concurring opinion of Justices Scalia and Ginsburg had characterized *Thornton* as having stretched the doctrine "beyond its breaking point." Justice O'Connor's concurrence

had pointed out that some lower court opinions applying *Belton* had lost sight of *Chimel's* energizing rationale:

> [L]ower court decisions seem now to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception justified by the twin rationales of *Chimel v. California.*

In repudiating *Thornton's* overreading of *Belton, Arizona v. Gant* emphatically stressed that a search incident to arrest does not constitute an investigative prerogative that vests and that the police may come back and redeem at some later time. It is quintessentially an emergency measure that may be employed only while the exigencies that gave rise to it are still operative. Justice Stevens's opinion made it clear that *Arizona v. Gant* was not changing in any way either *Chimel v. California* or *New York v. Belton* but was reaffirming them as they were meant to be.

> To read *Belton* as authorizing a vehicle search incident to every recent occupant's arrest would thus untether the rule from *the justifications underlying the Chimel exception*—a result clearly incompatible with *our statement in Belton that it "in no way alters the fundamental principles established in the Chimel case regarding the basic scope of searches incident to lawful custodial arrests."* Accordingly, we reject this reading of *Belton* .and hold that the *Chimel rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee* is unsecured and *within reaching distance of the passenger compartment at the time of the search.*

(Emphasis supplied).

Our point, as we reduce the clutter, is that *Arizona v. Gant* has nothing to do with this case. Room 133 of the Days Inn was not the passenger compartment of an automobile. *Arizona v. Gant* did not change basic search incident law and it did not change the way in which we measure the *Chimel* perimeter. Those verities abide.

### E. A One–Two Punch and the Need for Particularization

There was one critical time sequence in this case that has been almost completely ignored. The suppression hearing focused on the police entry into two bags that were 16 feet away and 7 feet away, respectively, from the appellant at the time of his arrest. Each of those bags, however, was entered twice. The initial set of entries occurred as Sergeant Maiello arrested the appellant. The other two officers, who had entered Room 133 as part of the arresting team, made a quick scan of the room for weapons. They opened and looked into each of the two bags. A few minutes later, but after the appellant had been arrested and removed from the room, the police came back and retrieved from the bags the drugs and drug paraphernalia that were ultimately the objects of the requested suppression.

With undifferentiated angst, the appellant seems uncon-cerned with whether his Fourth Amendment challenge is to the first set of entries or to the second set. He may consider the bags to have been subjected to a quick one-two punch, but each punch required its own Fourth Amendment justification and the justifications in this case would have been separate and distinct. The appellant, of course, was unhappy with both sets of searches, but he must particularize his unhappiness in doctrinal terms.

Assuming for the moment that the bags were within the appellant's *Chimel* perimeter, an issue we will examine *infra,* the initial looking into the bags for weapons was essentially contemporaneous with the arresting process and would qualify, therefore, as a legitimate search incident to lawful arrest. As we have already explained in an earlier context, however, search incident theory would not justify the second set of entries into the bags. As we have explained, the police prerogative of looking into the bags at the earlier time does not confer on the police an investigative entitlement that they may come back and redeem at a subsequent time. A search incident to lawful arrest is an emergency measure that lasts only as long as its twin exigencies are still operative.

In this case, however, the second set of intrusions was warranted not by search incident theory but by the Plain View Doctrine. The initial looking into the bags, a Fourth Amendment search by definition, was a prior valid intrusion by virtue of search incident law. In the course of those valid intrusions, the police then saw drugs in plain view with probable cause to believe that they were, indeed, drugs. That combination of three conditions, *ipso facto*, justified the Plain View Doctrine seizure of the drugs, then or later. *Coolidge v. New Hampshire*, 403 U.S. at 465–73, 91 S.Ct. 2022, *Arizona v. Hicks*, 480 U.S. 321, 326–28, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). The Plain View Doctrine, of course, is exclusively a seizure doctrine. It does not authorize the most minimal of searches, because the item being seized does not need to be searched for. It has already been discovered in plain view in the course of some prior search justified by some other rationale. We do not, moreover, hold a stop-watch on a Plain View Doctrine seizure as we do on a search incident to lawful arrest. If the doctrine's conditions are satisfied, the seizure is an investigative entitlement that the police may come back and redeem at a reasonably subsequent time.

## F. The Lingering Embers of Exigency

In looking closely at any search incident to lawful arrest, we encounter the familiar twin issues of time and place. When, to be an incident of the arrest, must the search take place? Where, to be an incident of the arrest, must the search take place? The appellant's challenge is double-barreled, contending that the search incident was both too late and too far. Our first inquiry will be with "When?"

The appellant's argument that the exigency of the arresting process was no longer operative is predicated almost entirely on *Arizona v. Gant's* use of the word "unsecured" to describe an arrestee whose arrest can still generate a search incident. The appellant, however, takes the word way out of context. The context of *Arizona v. Gant's* distinction between "secured" and "unsecured" was a situation wherein the arrestee had not only been handcuffed but had been led away from the

scene of the arrest and had been locked in the back of a patrol car. The appellant seeks to move the concept of "secured status" from the unquestioned tranquility of the post-arrest period back to a significantly earlier time when the arresting process is still in turbulent flux. The defense would like to pinpoint the cessation of hostilities at the first showing by the appellant of a white flag. As long as the arrest scene retains any potential of volatility, however, the courts, unwilling to risk a dead officer, will look on the arrestee as if he were Harry Houdini.[7] The controversial calls almost invariably will go to the State.

Contrary to the appellant's narrow view of the emergency phase, the exigency that will indisputably be extinguished once an arrestee is handcuffed *and* led out of the room *and* then placed in a patrol car has not yet been extinguished simply because a ringside commentator declares that the police seem to have acquired the upper hand or that the police appear to have gained the competitive advantage. Over the years, the courts, in the conscious interest of police safety and the safety of others, have been very generous in interpreting exigency in favor of a broad police prerogative. They are constrained not to declare the bout over until the referee has definitively counted ten. The "red alert" of exigency remains in effect until the pacification or immobilization of the arrestee is indisputably a *fait accompli.*

The appellant also argues that looking into the bags was not necessary because taking control of the bags by the police was

---

7. The appellant's argument that once handcuffs are on an arrestee, the exigency is over is belied by *United States v. Shakir,* 616 F.3d 315, 320 (3d Cir.2010):

In *Chimel,* the Supreme Court stated that searches of the "arrestee's person" *and* "the area into which an arrestee might reach" could be aimed at finding *weapons the arrestee might use "to effect his escape."* 395 U.S. at 763, 89 S.Ct. 2034. *The Court thus contemplated that such searches would take place after the suspect is restrained in some way.* To hold that a container search incident to arrest may not occur once the suspect is under the control of the police, but before he has been moved away from the item to be searched, would eviscerate this portion of *Chimel.*
(Emphasis supplied).

itself sufficient to extinguish that aspect of exigency. The law, however, has never limited the police, in extinguishing an exigency, to the least intrusive means that might be available. And see *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir.2010) ("[W]e have rejected the notion that an officer's exclusive control of an item necessarily removes the item from the arrestee's area of immediate control."); *United States v. Morales*, 923 F.2d 621, 626–27 (8th Cir.1991) (rejecting defense argument that search of his bags was improper because the police had gained exclusive control over the bags).

██ We hold that when the arresting officers first looked into the bags for weapons in this case, the exigency was still extant. Our attention now turns from the question of when the two bags were searched to the very different question of where the two bags were searched.[8]

## G. The Reach of the *Chimel* Perimeter

In fitting arrestees for their respective *Chimel* perimeters, one size does not fit all. The reach of the perimeter may ebb or flow with contributory circumstances. The arrest of a murderer in an alley at midnight will likely radiate a wider danger zone than will the mid-morning arrest of a fraudulent stockbroker at the office. The major factor, of course, is the size and age and physical prowess of the arrestee. Whistler's Mother, bound to her chair, would have a more constricted reach, lunge, or grasp than would a younger Mohammed Ali, who self-professedly could "float like a butterfly and sting like a bee." One size clearly does not fit all. As an inherently dangerous confrontation, an arrest inevitably involves un-

---

8. Under our primary holding, that the appellant as a parolee with an outstanding parole intake warrant outstanding for his arrest had no Fourth Amendment right against himself or his property being searched, the more nuanced distinctions we are herein making about when the bags were searched and where the bags were searched would be utterly immaterial. For the appellant as a parolee, the operative search zone was Room 133 with no further distinction in terms of the place of the search or the time of the search. Both the stop watch and the tape measure are excess baggage.

known and unpredictable factors. All doubts and ambiguities, however, are resolved by best serving the twin purposes for which the search-incident exception was designed: the protection of the police and the preservation of evidence.

The appellant points out, and we agree, that the suppression hearing transcript tells us very little about the physical characteristics of the appellant. We do not know his age or size or strength or mobility. All of that ignorance on our part, however, only underscores the wisdom of appellate deference to the factfinding of the trial judge. Judge Jackson saw and observed the appellant throughout the suppression hearing. He observed first-hand his age and size and general physical characteristics. These are things that an appellate court can never lift from the printed page. Just to head off a possible argument, incidentally, let us point out that the necessary evidence to support a decision must be presented to the trial court, not to the appellate court. In this case, such pertinent evidence was visually before the court. Judge Jackson, moreover, fully described many of the pertinent characteristics that he observed and took into consideration:

> [W]e have a *young man who doesn't have,* from any of the testimony, I cannot derive he [has] *any physical disabilities.* He doesn't appear to have any physical disabilities. *So he probably has, like many men of his age, cat-like reflexes.* He's in a room . . . *[T]he two bags* in question, *which were searched, were within his wing span.* Just *within one step or a half step, he would be able to access either bag and pull a weapon out.*

(Emphasis supplied). He also described the overall turbulence of the scene at the Days Inn:

> [W]e also have *a situation* that's a little *more heightened in terms of tension* because there is *an individual with an outstanding parole retake warrant* who has been identified positively by a photographic identification from a motel manager as *habituating the premises.* And Corporal Widdowson himself observes *drug activity in the parking lot,* somebody trying to inject heroin into his veins . . . *which*

*leads to room 133, which leads to a lock, unlock, relock, unlock, relock the door for about ten minutes,* what Corporal Widdowson called *a barricade situation* . . . [The appellant]'s in a room now confined by officers, or about to be confined, with rather small dimensions.

(Emphasis supplied).

When we map a particular *Chimel* perimeter, we measure outward from the epicenter of the arrestee. As cases such as *United States v. Robinson, supra,* and *Gustafson v. Florida, supra,* illustrate, moreover, the fact that there is no evidence that could be destroyed on a given occasion because the arrests were for crimes that generate no evidence will not operate to shrink the *Chimel* perimeter. The bright-line formula exempts the State from having to show actual exigency on an *ad hoc* basis. In this case, the appellant seeks, in just such an *ad hoc* fashion, to downplay the exigency and to pull back the search perimeter by pointing to the presence of three police officers in the Room 133 and to the absence of aggressive resistance by the appellant to his arrest. Such factors, however, will not make Judge Jackson's finding and ruling clearly erroneous.

In determining the range in space of a search incident to lawful arrest, the catalyst is the arrestee, not the police. We are assessing the likely maximum danger zone created by a given arrestee, essentially in the abstract. Once that *Chimel* perimeter is established, we do not then discount or diminish the arrestee's reach, lunge or grasp by subtracting from it some of its area based on the tactical or offensive counterforce possessed by the police. Nor do we scale back the danger zone as the contest unfolds. The exigency only ends when the arresting process is over. While it is still in progress, we do not balance countervailing forces, as a matter of fact. We take that version of the evidence and all inferences therefrom in the light most favorable to the prevailing party (in this case the State), as a matter of law. This, of course, is not a level playing field between the police and the arrestee, and it was never intended to be one. The purpose of

the search incident exception is, *inter alia*, to protect the police from any reasonably foreseeable risk of harm. The law bends over backward in that direction.

 We hold that Judge Jackson was not clearly erroneous in finding that the two bags were within the *Chimel* perimeter of the appellant. Let it be clear, moreover, what we are holding and what we are not holding. We are not holding that two containers, 7 feet away and 16 feet away from an arrestee, are necessarily within that arrestee's *Chimel* perimeter. That is not our call to make. What we are holding is that Judge Jackson, under the circumstances of this case, was not clearly erroneous as he found them to be within the appellant's *Chimel* perimeter.

In closing, let us note that in assessing this arrestee's wingspan or wingspread—his physical reach, lunge, or grasp—the 7 foot call was relatively easy. Arguably, the 16 foot call was pushing out the envelope a bit closer to its limits. Even if an appellate court, however, may occasionally wince as it reviews a finding of fact at or near the outer edge of the bell-shaped curve of deference, it pays to remember that if appellate deference truly is what it grandly proclaims itself to be, wincing comes with the territory.

## Harmless Hypothetical Error

Even if, purely *arguendo*, we were wrong in holding that the bag that was 16 feet away from him was within the appellant's *Chimel* perimeter, albeit having been right in holding that the bag 7 feet away was within his reach, lunge, or grasp, such error would, in our judgment, be harmless.

The appellant was convicted of the possession of heroin with the intent to distribute it and of the possession of drug paraphernalia. The nearer and less controversial of the two bags produced 58.3 grams of heroin. In terms of paraphernalia, that same bag also produced zip-type baggies, stamp pads, wax baggies, wooden stamps and pocket scales. The farther removed and more controversial bag produced an additional 29.5 grams of heroin. We are persuaded beyond a reasonable

doubt that the contents of the first bag alone, coupled of course with the accusation of the purchaser out on the parking lot, would have produced exactly the same jury verdicts. The addition of the more minimal contents of the second bag had no effect whatsoever on the outcome of the case. The second bag was redundant.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**