*Ontavius Deshard White v. State*, **No. 0891 of the 2019 Term, Opinion by Moylan, J.**

**HEADNOTES:**

**ILLEGAL POSSESSION OF A FIREARM – SUPPRESSION HEARING – EXECUTION OF AN OUTSTANDING SEARCH WARRANT – THE APPELLANT WAS ARRESTED – THE SUPPRESSION HEARING RULINGS – THE CONTENTIONS – THE STANDARD OF REVIEW – THE THRESHOLD OF FOURTH AMENDMENT APPLICABILITY – STANDING TO OBJECT – THE MERITS OF THE FOURTH AMENDMENT – THE SPECIAL EXCEPTION OF ARIZONA V. GANT – A SHAKY PEDIGREE – THIS IS NOT A CARROLL DOCTRINE CASE – THE GEOGRAPHY OF THE SEARCH INCIDENT – THE CAR SEARCH IN THIS CASE – THE SANCTION, IF ANY, FOR A FOURTH AMENDMENT VIOLATION – INEVITABLE DISCOVERY -- INEVITABLE DISCOVERY IN THIS CASE -- "WHEN THE HURLY BURLY'S DONE" -- APPENDIX: ORGANIZING THE FOURTH AMENDMENT**

Circuit Court for Anne Arundel County
Case No. C-02-CR-19-000370

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0891

September Term, 2019

_____

ONTAVIUS DESHARD WHITE

V.

STATE OF MARYLAND

_____

Fader, C.J.,
Shaw Geter,
Moylan, Charles E., Jr.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed:  October 1, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

To say that this case deals with a variety of Fourth Amendment issues does not do justice to the breadth and depth of the appeal before us. This omnibus appeal presents us not simply with three different Fourth Amendment problems. Such a merely quantitative accumulation of issues would not be at all unusual. The particular combination of issues before us in this case, however, is one where each of the questions before us engages the gears of an entirely separate and distinct level or plane of Fourth Amendment inquiry. Those absolutely distinct levels or planes of inquiry are:

I.      The Coverage or Applicability of the Fourth Amendment

II.     The Merits or Substance of the Fourth Amendment

III.    The Sanction, If Any, for a Fourth Amendment Violation

Our tripartite inquiry herein touches, in turn, each of those distinct planes or levels of Fourth Amendment involvement.

At the first of these levels, the very threshold of Fourth Amendment applicability, there must be 1) coverage of the place searched or thing seized, 2) coverage of the person of the searcher (state action), and 3) coverage of the person of the defendant under the circumstances of the case (standing to object). Absent such threshold applicability, the subsequent question of whether the Fourth Amendment merits might have been satisfied or might have been violated in some other world where the Fourth Amendment did apply would be absolutely irrelevant.

At the second and more familiar of these dimensions or levels of presence, the actual merits, the ultimate substance, of the Fourth Amendment's command that searches and seizures be reasonable, the territory is largely controlled by the centrality of the warrant

requirement and its list of jealously guarded exceptions. This is the home turf of most Fourth Amendment adjudication.

The third and final level of Fourth Amendment inquiry is that of what sanction, if any, should be applied for a particular Fourth Amendment violation. Involved here are the familiar Exceptions to the Exclusionary Rule of 1) attenuation of taint, 2) independent source, and 3) inevitable discovery.

All three of these fundamental levels of Fourth Amendment involvement are before us on the present appeal. "On such a full sea are we now afloat."[1]

*          *          *

For the three-dimensional Fourth Amendment voyage on which we now embark, our Odysseus will be the appellant, Ontavius Deshard White, who was indicted in the Circuit Court for Anne Arundel County, Maryland, and charged with several narcotics and firearms offenses. After his pre-trial motion to suppress evidence was denied, he entered a not guilty plea on an agreed statement of facts to one count of illegal possession of a firearm by a disqualified person. Appellant was then sentenced to five years, without possibility of parole. On this timely appeal, the appellant asks:

> Did the lower court err in denying Appellant's motion to suppress the fruits of a warrantless search of the vehicle that Appellant was driving?

Holding that the suppression hearing court did so err, we shall reverse.

**Execution Of An Outstanding Arrest Warrant**

---

[1] Shakespeare, <u>Julius Caesar</u>, Act 4, Scene 3.

The testimony at the suppression hearing was as follows. Officer Robert Padgett, an 11 year veteran of the Anne Arundel County Police Department who was then assigned to the Fugitive Apprehension Team, testified that he was detailed with locating and arresting appellant pursuant to an open arrest warrant on charges of armed carjacking, unlawful taking of a motor vehicle, and other related handgun offenses. On January 16, 2019, Officer Padgett began surveillance in the area of 412 Summer Wind Way in Glen Burnie, Maryland, when, at around 1:33 p.m., he saw an individual matching appellant's physical description walk out of the apartment building and approach a silver Hyundai Elantra. Appellant walked to the vehicle, took a pair of shoes out of the trunk, and then walked back into the apartment building. Officer Padgett checked the license on the Elantra and learned that it was a leased vehicle.

Shortly thereafter, appellant, now wearing a black jacket, returned to the vehicle and proceeded to drive to the Glen Burnie Car Wash, located at 7985 Crain Highway in Glen Burnie. Officer Padgett continued his covert surveillance and saw appellant initially back the Elantra into a vacuum cleaning station. The officer then radioed police dispatch, and informed them that he followed an armed carjacking suspect to the car wash and needed back up units to respond.

### The Appellant Was Arrested

Meanwhile, appellant moved the Elantra into the third bay of the car wash. At around that same time, two other officers arrived on the scene and positioned themselves at either side of the bay. Appellant then was apprehended without incident and Officer Padgett positively identified him as the suspect wanted pursuant to the arrest warrant.

3

After appellant was handcuffed, Officer Padgett asked him about the Elantra, and appellant replied that it belonged to his girlfriend. However, Officer Padgett testified that he knew otherwise, stating, "at that point, I had already ran it. I knew it was a leased vehicle, so I didn't know if it was leased to her or not." Upon further questioning by the court, Officer Padgett testified that the Elantra belonged to "All Car Leasing," and that one "Roxanne Douglas" was the lessee. He also confirmed that the lease had expired one day prior to this stop.

Officer Padgett continued that "at that point, we just did a search based off evidence related to the armed carjacking." The officer confirmed that appellant stood about ten feet behind the vehicle, within the car wash bay, while the search was conducted.

Officer Padgett then explained that the Elantra would need to be towed, testifying as follows:

Q. Okay. And what, if anything, was your plans for this vehicle?

A. At that point, being where it was, we would try to verify a couple things, but at that point, it was -- it was going to be -- have to be removed from that car wash bay because we were blocking business for this car wash.

Q. Do you know whether or not you were planning on towing it?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

THE WITNESS: Once we verified a couple of things and realized that the vehicle was supposed to be returned the day before, we -- a tow was inevitable, correct.

BY [PROSECUTOR]:

Q. So it was a leased vehicle?

4

A. Yes, sir.

Q. It was a day late?

A. Yes, sir.

Q. And your plan was to tow it?

A. Yes, sir.

Officer Padgett was then asked about police procedures with respect to towing the vehicle under the circumstances, and appellant objected. At the court's behest, the prosecutor explained that "it is partially my argument that this leads to basically an inevitable discovery argument based on an inventory search, based on they were going to tow the vehicle anyway." The court overruled the objection and Officer Padgett testified as follows:

> THE WITNESS: So the procedure for the tow is that we inventory any valuables. So we would look through, pretty much, the entire vehicle just to make sure that nothing of value needed to be reported, and to just list the items on the actual Tow Inventory Report.
>
> BY [PROSECUTOR]:
>
> Q. And if Mr. White had owned the vehicle, would you have towed it?
>
> A. If he had owned the vehicle, there's procedures that we have to take. So if he was willing to give it to somebody, and that person had a legal driver's license and everything like that, and they could get there within a reasonable amount of time, then yes, we would. If he provided somebody that couldn't get there within a reasonable amount of time or didn't have a driver's license, then we would have to tow it 'cause we can't waste time at the car wash. It's a business.
>
> Q. But after checking the records, it was your understanding Mr. White did not own it?
>
> A. He did not own it. No, sir.

Q. And this was a leased vehicle?

A. Yes, sir.

Officer Padgett and another officer then began to search the Elantra. They found the black jacket appellant was seen wearing when he left his apartment building lying across the front passenger seat. When lifted off the seat, the police found a black handgun laying on top of a blue bag adorned with a Dallas Cowboy's logo. Direct examination then concluded as follows:

Q. And you said you were partially searching the vehicle because of the crime that you were arresting him for?

A. Yes, sir.

Q. And why would -- what, if anything, made you believe that crimes of -- or fruits of that crime would be in that vehicle?

A. So we had understood there was an armed carjacking where a black handgun was used, and it had never been recovered at that point.

On cross-examination, Officer Padgett testified that he knew that the original charges against appellant for armed carjacking occurred on or around December 29, 2018, or approximately 18 days prior to the arrest at the car wash, at an Extended Stay Hotel located ten miles away in Linthicum, Maryland. The officer also agreed that the original charges only indicated that a "handgun" was used in the crime and simply referred to "a vehicle," as opposed to any specific make or model.[2]

---

[2] The arrest warrant, issued on January 11, 2019 and included with the record on appeal, refers to an incident involving appellant and two alleged victims near the Extended Stay Hotel and Hoyts Movie Theater, located on International Drive in Linthicum, Maryland, at around 11:18 p.m. on December 29, 2018. According to the application for statement of charges, it was alleged that appellant robbed these

In addition, Officer Padgett testified that he saw appellant pull the Elantra into a car wash bay, used for self-washes, after parking momentarily at the vacuum station. Appellant also was located outside the vehicle, approximately ten feet away, when he was placed in handcuffs and arrested. The officer agreed that a pat-down of appellant's person did not uncover any weapons or contraband on his person.    Following this testimony, the court heard argument concerning: (1) whether the search was lawful as a search incident to a valid arrest; (2) whether there was reasonable articulable suspicion to believe fruits of the original armed carjacking were in this vehicle; and/or (3) whether the search could be upheld as an inventory search under the inevitable discovery doctrine. Prior to hearing from appellant, the court inquired whether appellant had standing to challenge the search. Appellant maintained that he had standing as the sole occupant and operator of the vehicle with apparent authority to drive it under the circumstances. Appellant also challenged the State's rationales for the search of the vehicle, noting that: (1) appellant stood ten feet away from the car in handcuffs when it was searched; (2) appellant was arrested 18 days after the armed carjacking; and, (3) the police could have called appellant's girlfriend to the scene to retrieve the car or simply moved it out of the car wash bay without inventorying its contents.

## The Suppression Hearing Rulings

After hearing these arguments, the court denied the motion to suppress, finding first that appellant did not have standing to challenge the search. The court noted that appellant

individuals of approximately cash, credit cards, clothing, and, at least temporarily, their "vehicle," using a "dark-colored pistol" or "handgun."

was not the lessee of the Elantra and that, even if he had been, the lease had expired. As will be discussed more fully infra, the court essentially reached its conclusion on the basis of proprietary standing and did not go on to analyze the more nuanced question of derivative standing.

The court then turned to a search incident rationale, observing that "Arizona v. Gant [556 U.S. 332 (2009)] seriously changed the landscape of 4th Amendment jurisprudence with regard to car stops." After analyzing the history of the relevant law, the court disagreed that the public safety rationale supported the search incident given that appellant was outside the vehicle and in handcuffs, and further, given the temporal and spatial distinctions between the underlying offense that formed the basis for the arrest warrant, *i.e.*, the armed carjacking 18 days earlier some 20 miles away from the scene of the arrest.

Nevertheless, the court agreed that the search could be upheld as an inventory search under the Inevitable Discovery doctrine. Observing that the car was stopped in a car wash bay and was being operated on an expired lease, the court found that this "militated in favor of towing the vehicle." The court concluded as follows:

> So to summarize, this Court finds that <u>there are</u>, sort of, <u>three broad brush strokes that were kind of presented</u> -- well, two were presented to the Court today. <u>One</u>, they sort of what <u>I'll characterize as the Belton/Gant analysis, or search incident to the arrest analysis</u>. And I find on that ground the Defendant prevails, but you only need one additional ground -- or one ground to deny a motion. And <u>this Court finds that the standing issue is really what controls</u>. <u>But even if that were not present, the Court would also find that, based on the circumstances, there was not cause by law enforcement</u>. <u>The inevitable discovery doctrine also applies</u>. And for both of those reasons, one and three if you will, <u>the Court is denying the Defendant's motion to suppress the evidence</u>.

(Emphasis supplied.)

## The Contentions

In a remarkable tour-de-force of condensation, the appellant raises a single and almost taciturn contention:

> THE LOWER COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE FRUITS OF A WARRANTLESS SEARCH OF A VEHICLE WHERE APPELLANT WAS THE SOLE OCCUPANT AND DRIVER.

There is a lot of content jammed into a small assertion.

That unilluminating contention embraces essentially the entire universe of the Fourth Amendment. In that deceptively simple but encyclopedic contention, the appellant presents us with a veritable fusillade of academic teasers. That simple assertion contains a labyrinth. The appellant might as readily have included half a dozen reasons why, in his judgment, the judge made a mistake in an all-embracing contention that the judge "made a mistake." Indeed, in arguing the contention, the appellant does expand outward into a variegated argument more reflective of the breadth of the Fourth Amendment issues confronting us on this appeal.

The State, by contrast, in its listing of its perception of the contentions, more accurately captures the broad sweep of what is before us, three issues touching respectively 1) the threshold applicability of the Fourth Amendment, 2) the actual merits or substance of the Fourth Amendment, and 3) the sanction, if any, for a Fourth Amendment violation.

1. WHITE DID NOT HAVE <u>STANDING TO CHALLENGE</u> THE SEARCH OF THE CAR HE WAS DRIVING.

2. THERE WAS <u>REASONABLE SUSPICION</u> TO BELIEVE THAT A SEARCH OF THE VEHICLE WOULD REVEAL EVIDENCE OF ARMED CARJACKING.

3.  THE GUN WOULD HAVE <u>INEVITABLY BEEN DISCOVERED</u> WHEN THE CAR WAS TOWED FROM THE CAR WASH BAY.

(Emphasis supplied.) We will follow the State's outline.

## The Standard of Review

In considering motions to suppress evidence under the Fourth Amendment, our review is "limited to the record developed at the suppression hearing." <u>Pacheco v. State</u>, 465 Md. 311, 319-20, 214 A.3d 505 (2019) (quoting <u>Moats v. State</u>, 455 Md. 682, 694, 168 A.3d 952 (2017)). The record is assessed "in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress."[3] <u>Norman v. State</u>,

---

[3] It is a standard provision of appellate review, so familiar as to be almost a cliché, that the reviewing court will view the facts in the manner most favorable to the prevailing party. In this case, that raises an interesting question which, fortunately, we do not have to resolve. <u>Varriale v. State</u>, 444 Md. 400, 410, 119 A.3d 830 (2015) speaks of assessing the record "in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress."

In this case, on the ultimate issue of the suppression of the evidence, the State was the prevailing party. Involved in that ultimate resolution, however, were the resolutions of three lesser included questions. On the threshold sub-issue of standing, the State was also the prevailing party. On the final sub-issue of Inevitable Discovery, the State was once again the prevailing party. On the intermediate sub-issue of Fourth Amendment satisfaction, involving the special <u>Arizona v. Gant</u> exception to the warrant requirement, however, the appellant was the prevailing party. We are now about to embark on a review of all four of these resolutions by the suppression court.

On the intermediate issue of the special <u>Arizona v. Gant</u> exception to the warrant requirement, should our assessment of the facts be in the light most favorable to the appellant as the prevailing party on that particular issue or in the light most favorable to the State as the prevailing party on the ultimate suppression issue? Fortunately, the resolution of that intermediate issue is so open and shut that it won't make a bit of

452 Md. 373, 386, 156 A.3d 940 <u>cert.</u> <u>denied</u>, 138 S. Ct. 174 (2017). Further, although the motion court's factual findings are accepted unless clearly erroneous, we review <u>de</u> <u>novo</u> the "court's application of the law to its findings of fact." <u>Pacheco</u>, 465 Md. at 319 (citation omitted).

## I.    The Threshold Of Fourth Amendment Applicability

The appellant's initial challenge is to the ruling by the suppression hearing court that the appellant lacked standing to object. Properly to understand this challenge, we need to pause for a moment and look at the larger genus of which standing is but a species. In resolving the standing question, for instance, we are not at all interested in the Fourth Amendment merits. As an aspect of the threshold issue of Fourth Amendment applicability, standing is only concerned with the entitlement of the appellant to litigate those merits, not with the ultimate merits themselves. A solid grasp of this fundamental difference between applicability and satisfaction is the necessary analytic starting point.

William W. Greenhalgh, <u>The Fourth Amendment Handbook</u>, (4th Ed. 2019), Introduction, p.1, introduces a study of the Fourth Amendment with the concept:

> The key to any true understanding is an appreciation of <u>the vast conceptual difference between the issue of Fourth Amendment applicability and the very different issue of Fourth Amendment compliance</u>. When dealing with the latter, our judges are the keepers of the sacred flame, the enforcers of the values written into the Bill of Rights by the framers. The Fourth Amendment demands of law enforcement good things like warrants, probable cause, exigency, and police good faith. They all, however, are but the sub-criteria by which we measure something else: reasonableness. For

difference. We need not worry what the tiebreaker is when there is no tie to break. It remains, however, an interesting question.

Fourth Amendment purposes, the police have to be reasonable when they search and when they seize because the Fourth Amendment demands it of them.

The "flip-side" of the same logic, however, is that when the Fourth Amendment does not apply, the commandment to be reasonable, which exists only by virtue of the Fourth Amendment, does not apply either.

(Emphasis supplied.)

In Gilbert & Moylan, Maryland Criminal Law: Practice and Procedure, (1983), Ch. 25 "The Threshold Question of Fourth Amendment Applicability," p. 280, the authors advise:

Our mental checklist as we approach an arguable Fourth Amendment problem should always alert us to ask two elemental questions:
`
1) Is it applicable?
2) Has it been satisfied?

Inserted between the two questions should come the clear direction, "(DO NOT, REPEAT, DO NOT, GO ON TO QUESTION NO. 2 UNLESS THE ANSWER TO QUESTION NO. 1 IS 'YES')". There is a profound difference in character between the issues of applicability and compliance…

(Emphasis supplied.) See also Moylan, "The Fourth Amendment Inapplicable v. The Fourth Amendment Satisfied: The Neglected Threshold of 'So What?'", 76 So. Ill. U.L.Rev. 75 (1977).

Indeed, the rules and standards for litigating an issue of Fourth Amendment applicability and an issue of Fourth Amendment satisfaction diverge widely from each other. As long as the State makes a timely challenge in the first instance, the burden is clearly cast on the defendant to prove Fourth Amendment applicability in all of its manifestations. Before he may even litigate the merits, the burden is allocated to the defendant to prove that the Fourth Amendment actually covers the place that was the situs

12

of the search. <u>Hestor v. United States</u>, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); <u>Oliver v. United States</u>, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Similarly, the burden is cast on the defendant to prove that the Fourth Amendment covers the person of the searcher (state action). <u>Burdeau v. McDowell</u>, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); <u>Colorado v. Connelly</u>, 475 U.S. 1116, 106 S.Ct. 1629, 90 L.Ed.2d 177 (1986). When challenged, the defendant must also establish the Fourth Amendment coverage of himself under the circumstances, to wit, his standing to litigate the Fourth Amendment merits. <u>Cecil Jones v. United States</u>, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); <u>Minnesota v. Olson</u>, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); <u>Minnesota v. Carter</u>, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

In resolving an applicability issue, moreover, we are interested in a historic fact, objectively viewed. Was the place covered? Was the person of the searcher covered? Was the person of the defendant covered under the circumstances of the case, to wit, did the defendant have standing to object? In resolving a Fourth Amendment satisfaction issue, on the other hand, we are frequently looking not at the historic fact <u>per</u> <u>se</u>. We are looking, rather, at the evidence from the subjective point of view of the police officer. How did the evidence appear to the officer? On the Fourth Amendment merits, we are generally measuring the reasonableness of the police behavior.

<u>United States v. Leon</u>, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and the other Good Faith Exception cases illustrate vividly the frequent necessity, when dealing with the Fourth Amendment merits, of shifting from the objective focus to the subjective focus and of shifting from the concern with historic fact to concern from the perspective of

13

the reasonable police officer. When assessing the search warrant itself, for instance, we measure objectively such historic facts as probable cause, nexus, and adequacy of description. When dealing, however, not with the warrant per se but with the reasonableness of the officer who served the warrant, our focus shifts from the objective to the subjective and our concern is not with historic fact of whether the warrant was good or bad but with the perspective of the officer who executed it. Did he behave reasonably on the basis of how things appeared to him?

## Standing to Object

The first issue before us in this case is one of threshold applicability. It is whether the appellant had standing to object to the search of a borrowed automobile that he is driving at the time he was stopped by police. Standing is the "threshold question of the entitlement to litigate the merits of the search and seizure." Bates v. State, 64 Md. App. 279, 282, 494 A.2d 976 (1985).  It is "exclusively a threshold question of applicability, concerned only with the coverage by the Fourth Amendment of the defendant who seeks to raise a Fourth Amendment challenge." State v. Savage, 170 Md. App. 149, 174, 906 A.2d 1054 (2006).  The question in every case of standing "depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d (1978) (addressing the Fourth Amendment rights of passengers in vehicles).

Both parties direct our attention to Byrd v. United States, ___ U.S. __, 138 S.Ct. 1518, 200 L.Ed.2d 805 (2018).  In that case, Byrd was stopped outside Harrisburg,

14

Pennsylvania by Pennsylvania State Troopers while driving a vehicle rented in another's name. Byrd, 138 S.Ct. at 1524. After learning that Byrd was not listed on the rental agreement as an authorized driver, that he had prior drug and weapons convictions, and that Byrd admitted he had a marijuana cigarette in the vehicle at the time, the troopers searched the rented vehicle and discovered body armor and 49 bricks of heroin in the trunk. Id. at 1525. The lower courts denied Byrd's motion to suppress the evidence, concluding that he lacked a reasonable expectation of privacy in the car. Id. After citing general principles on standing, id. at 1526-27, the Court observed:

> One who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it. More difficult to define and delineate are the legitimate expectations of privacy of others.
>
> On the one hand, as noted above, it is by now well established that a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it.
>
> On the other hand, it is also clear that legitimate presence on the premises of the place searched, standing alone, is not enough to accord a reasonable expectation of privacy, because it "creates too broad a gauge for measurement of Fourth Amendment rights."

(Emphasis supplied.) 138 S. Ct. at 1527 (quoting Rakas, 439 U.S. at 142, 148).

The Court recognized that it had "not set forth a single metric or exhaustive list of considerations to resolve the circumstances in which a person can be said to have a reasonable expectation of privacy[,]" id., but explained that legitimate expectations of privacy are derived by either "concepts of real or personal property law" or "to

understandings that are recognized and permitted by society." Id. The Court then decided which of these two principles applied to the case at hand:

> The two concepts in cases like this one are often linked. "One of the main rights attaching to property is the right to exclude others," and, in the main, "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." *Ibid.* (citing 2 W. Blackstone, Commentaries on the Laws of England, ch. 1). This general property-based concept guides resolution of this case.

(Emphasis supplied.) Byrd, 138 S. Ct. at 1527.

Summarizing the arguments before it, the Government sought to advance the theory that only authorized drivers of rented vehicles had a legitimate expectation of privacy, while Byrd wanted standing. The Court observed that the Government's rule amounted to a misreading of the pertinent law established in Rakas*, supra*:

> The Court in Rakas did not hold that passengers cannot have an expectation of privacy in automobiles. To the contrary, the Court disclaimed any intent to hold "that a passenger lawfully in an automobile may not invoke the exclusionary rule and challenge a search of that vehicle unless he happens to own or have a possessory interest in it." 439 U.S., at 150, n. 17, 99 S.Ct. 421 (internal quotation marks omitted). The Court instead rejected the argument that legitimate presence alone was sufficient to assert a Fourth Amendment interest, which was fatal to the petitioners' case there because they had "claimed only that they were 'legitimately on [the] premises' and did not claim that they had any legitimate expectation of privacy in the areas of the car which were searched." *Ibid*.

(Emphasis supplied.) Byrd, 138 S. Ct. at 1528.

Furthermore, unlike the passengers in Rakas*, supra*, Byrd, like the case before us now, involved a driver and sole occupant of a rented vehicle. Byrd, 138 S.Ct. at 1528. Noting the distinctions the Court had made in cases involving automobiles, including

between passengers and those in exclusive control of the vehicle, see Rakas, 439 U.S. at 154 (Powell, J., concurring), the Court explained:

> The Court sees no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is rented or privately owned by someone other than the person in current possession of it, much as it did not seem to matter whether the friend of the defendant in [Jones v. United States, 362 U.S. 257, 267 (1960), overruled by United States v. Salvucci, 448 U.S. 83 (1980)] owned or leased the apartment he permitted the defendant to use in his absence. Both would have the expectation of privacy that comes with the right to exclude. Indeed, the Government conceded at oral argument that an unauthorized driver in sole possession of a rental car would be permitted to exclude third parties from it, such as a carjacker.

(Emphasis supplied.) Byrd, 138 S. Ct. at 1528-29.

The Court then dispensed with the Government's argument that Byrd was operating the vehicle in violation of contract principles:

> Putting the Government's misreading of the contract aside, there may be countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it -- perhaps the renter is drowsy or inebriated and the two think it safer for the friend to drive them to their destination. True, this constitutes a breach of the rental agreement, and perhaps a serious one, but the Government fails to explain what bearing this breach of contract, standing alone, has on expectations of privacy in the car. Stated in different terms, for Fourth Amendment purposes there is no meaningful difference between the authorized-driver provision and the other provisions the Government agrees do not eliminate an expectation of privacy, all of which concern risk allocation between private parties -- violators might pay additional fees, lose insurance coverage, or assume liability for damage resulting from the breach. But that risk allocation has little to do with whether one would have a reasonable expectation of privacy in the rental car if, for example, he or she otherwise has lawful possession of and control over the car.

(Emphasis supplied.) Byrd, 138 S.Ct. at 1529.

Indeed, the "central inquiry" concerned Byrd's lawful possession of the vehicle. Byrd, 138 S.Ct. at 1529. Recognizing that a different analysis may be required in the case of a hypothetical car thief, an issue not properly before the Court in any event, id., at 1529-30, and that the ultimate issue to be decided by the lower court on remand was not jurisdictional, but rather, whether there was probable cause to support the search, Id. at 1530-31, the Court concluded:

> Though new, the fact pattern here continues a well-traveled path in this Court's Fourth Amendment jurisprudence. Those cases support the proposition, and the Court now holds, that the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy. The Court leaves for remand two of the Government's arguments: that one who intentionally uses a third party to procure a rental car by a fraudulent scheme for the purpose of committing a crime is no better situated than a car thief; and that probable cause justified the search in any event. The Court of Appeals has discretion as to the order in which these questions are best addressed.

(Emphasis supplied.) Byrd, 138 S.Ct. at 1531.

The evidence in this case established that the Elantra was leased by Roxanne Douglas, the appellant's girlfriend, from All Car Leasing, and that that lease had expired by one day. Roxanne Douglas had loaned the car to the appellant. Appellant was the sole occupant and driver of the vehicle when it left the apartment building and was stopped inside a car wash bay at the Glen Burnie Car Wash. Although he was not listed on the leasing agreement, and although that contract had expired, applying Byrd, supra, we are persuaded that appellant had a legitimate expectation of privacy in the vehicle. For that

reason, we conclude that the motion court erred in concluding that appellant did not have standing to challenge the search.

Thus, the Fourth Amendment did apply to the appellant as it conferred on him the entitlement to object to the search of the borrowed car he was driving at the time it was stopped. The fact that the lender, in turn, had leased the car from a rental agency did not compromise the appellant's Fourth Amendment protection in the borrowed car. The suppression hearing looked too narrowly at proprietary standing alone and did not go on to consider derivative standing. The entitlement of the appellant to litigate the Fourth Amendment merits made it appropriate for the suppression hearing to go on and litigate those Fourth Amendment merits that were properly raised.

## II.    The Merits of the Fourth Amendment

By its very terms, the Fourth Amendment confers upon "the people" the right to be "secure… from unreasonable searches and seizures." The core of that protection lies in the adjective "reasonable." The commandment to government is that it (the State, the police) behave reasonably when it searches and when it seizes. In implementing that right, the concept of reasonableness has evolved over two and one-half centuries into what has been conveniently labelled as "The Centrality of the Warrant Requirement and Its List of Jealously Guarded Exceptions." The articulation of that concept may be found in <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971):

> Thus the most basic constitutional rule in this area is that '<u>searches conducted outside the judicial process</u>, without prior approval by judge or magistrate,

are per se unreasonable under the Fourth Amendment-- subject only to a few specifically established and well delineated exceptions.

(Emphasis supplied.) See also Katz v. United States, 359 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[4]

The appellant in this case was, to be sure, arrested on the basis of a valid outstanding arrest warrant. The arrest warrant, however, based on a crime that had occurred 10 miles away and 18 days earlier, did not authorize a search of the Elantra. Faulkner v. State, 156 Md.App. 615, 642, 847 A.2d 1216 (2004)("[A]n arrest warrant cannot be substituted for a search warrant.") Accordingly, the burden devolved upon the State to show that the warrantless search of the Elantra was reasonable pursuant to one of the jealously guarded exceptions to the warrant requirement. That list of well-delineated exceptions is a familiar one. It includes:

1. **Search Incident To Lawful Arrest**. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

2. **The Carroll Doctrine or Automobile Exception**. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); New York v. Class, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). See also Moylan, "The Automobile Exception: What It

---

[4]     Essentially, most of the exceptions to the warrant requirement are responses to some form of exigency that makes it unfeasible, if not impossible, for the police to obtain a warrant before searching. Might it be possible to reduce the entire package to the simple commandment, "**YOU ALWAYS HAVE TO GET A WARRANT**—*unless you can't*"?

Is and What It Is Not—a Rationale in Search of a Clearer Label," 27 Mercer L.Rev. 987 (1976).

3. **Hot Pursuit and Emergency Circumstances generally**. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

4. **Stop and Frisk**. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 1889 (1968).

5. **Plain View Doctrine**. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

6. **Consent**. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

## The Special Exception Of Arizona v. Gant

In 2009, however, there was added to the list of exceptions to the warrant requirement an arguably additional exception that is difficult to characterize.

7. **Special Exception of Arizona v. Gant**

To our chagrin, this is the exception relied upon by the State in this case. Arizona v. Gant is a confusing case. Litigants are unsure whether simply to deal with it ad hoc or to attempt to fit it into a pre-existing and larger totality. This is a natural confusion because the Arizona v. Gant opinion concludes with two separate and very different rationales. One of them fits neatly into a pre-existing and larger totality—Search Incident to Lawful Arrest. The other does not. It is, indeed, ad hoc. That second rationale constitutes a special ad hoc exception to the warrant requirement of its own.

If it would be presumptuous of us to label that special <u>Arizona v. Gant</u> exception as aberrational, it is, at the very least, arbitrary. It is one of the exceptions, of course, because, on one occasion at least, five Supreme Court justices said that it was. It is nonetheless arbitrary because it does not follow from any known body of precedent in the Supreme Court caselaw. It is arbitrary because it is not a logical development from any discernible body of Supreme Court principles. It is arbitrary because it serves no articulated purpose. How then did it come to be?

As the majority opinion in the 5-4 decision in <u>Arizona v. Gant</u>, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), reached its denouement, it concluded with, in a single sentence, twin holdings or twin rationales, 556 U.S. at 351:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search <u>or it is reasonable to believe the vehicle contains evidence of the offense of arrest</u>.

(Emphasis supplied.)

The first of those twin rationales—the circumstance that "the arrestee is within reaching distance of the passenger compartment at the time of the search"—is not a part of the special <u>Arizona v. Gant</u> exception that we are now dealing with. It is, rather, an unexceptional and logical development of the Search Incident to Lawful Arrest exception.

### A Shaky Pedigree

The second of those twin rationales— permitting the search of the passenger compartment if "it is reasonable to believe the vehicle contains evidence of the offense of arrest"— is <u>ipso</u> <u>facto</u> the special <u>Arizona v. Gant</u> exception that is now before us. It

22

seemingly appeared out of nowhere and was not a product of the rationale cogently worked out in the preceding opinion. Justice Stevens's opinion for the Court had presented a cogent argument leading to the first of the twin rationales. The argument in favor of the second of the twin rationales was made only by Justice Scalia in his concurring opinion. 556 U.S. at 351-354. What is now this special Arizona v. Gant exception had earlier been championed by Justice Scalia in his concurring opinion in Thornton v. United States, 541 U.S. 615, 629-631, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004). Justice Scalia had been a consistent and vehement critic of the Chimel v. California— New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), line of cases leading up to Arizona v. Gant. In Arizona v. Gant, Justice Scalia joined the majority opinion as the fifth and indispensable vote to create that majority. At the very end of his concurring opinion, he openly acknowledged that the second of the twin rationales of the majority opinion was the price to be paid for his vote.

> No other Justice, however, shares my view that application of Chimel in this context should be entirely abandoned. It seems to me unacceptable for the Court to come forth with a 4–to–1–to–4 opinion that leaves the governing rule uncertain. I am therefore confronted with the choice of either leaving the current understanding of Belton and Thornton in effect, or acceding to what seems to me the artificial narrowing of those cases adopted by Justice Stevens. The latter, as I have said, does not provide the degree of certainty I think desirable in this field; but the former opens the field to what I think are plainly unconstitutional searches—which is the greater evil. I therefore join the opinion of the Court.

(Emphasis supplied.) 556 U.S. at 354. Justice Scalia was far from completely happy with the second of the twin rationales framed by the majority opinion, but he considered it to be the lesser of two evils. As time now goes by, let it not be forgotten that this is the misbegotten pedigree of the exception now blithely (or grudgingly) accepted as part of the

status quo and now urged upon us by the State in this case. If not aberrational, it is at least arbitrary.

## This Is Not A <u>Carroll</u> Doctrine Case

As an exception, it is arbitrary because there are in it bits or aspects of the <u>Carroll</u> Doctrine or Automobile Exception and also bits or aspects of the Search Incident to Lawful Arrest exception, but it serves the purpose of neither of these well-recognized exceptions and it does not follow as a logical application of either of those exceptions. Like the <u>Carroll</u> Doctrine, it authorizes the search of an automobile for evidence of crime upon a likelihood that such evidence is present in the car. Whereas the <u>Carroll</u> Doctrine requires that the likelihood satisfy the probable cause standard, the <u>Arizona v. Gant</u> special exception lowers the bar of likelihood to one of reasonable suspicion. The <u>Arizona v. Gant</u> exception, on the other hand, does insist, unlike the <u>Carroll</u> Doctrine that the likelihood occurs in conjunction with an arrest. Whereas the <u>Carroll</u> Doctrine permits a search of the entire car including the trunk, the <u>Arizona v. Gant</u> exception limits the search to the passenger compartment. Whereas the <u>Carroll</u> Doctrine places no limits on the character of the suspected evidence, the <u>Arizona v. Gant</u> exception limits the predicate for the search to "evidence of the offense of arrest." The <u>Arizona v. Gant</u> exception is not in any way an arguable outgrowth of the <u>Carroll</u> Doctrine other than in the fact that it applies to an automobile.


## The Geography Of The Search Incident

Just as the <u>Arizona v. Gant</u> exception is not an outgrowth of the <u>Carroll</u> Doctrine, neither is it an outgrowth of Search Incident law. The purpose served by the <u>Arizona v.</u>

24

Gant exception is the discovery of evidence bearing on the crime for which the arrest is made. That is not remotely the purpose of a Search Incident. The purpose of the Search Incident exception is to regulate the behavior of the arrestee in the course of his being arrested. It serves the twin purposes of 1) preventing the arrestee from grabbing a weapon and harming the arresting officer, and 2) preventing the arrestee from destroying any accessible and readily destroyable evidence. Such evidence, moreover, can be evidence of any crime and need not be related to the crime for which the arrest was made. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

The first of the twin rationales announced by the Arizona v. Gant opinion— the one toward which the entire opinion had been pointing— was a logical outgrowth of the Search Incident exception. The other rationale— what is now the special Arizona v. Gant exception— was not. The Arizona v. Gant case followed logically from Chimel v. California (1969) and New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) in dealing with one final nuance of Search Incident geography.

In Feaster v. State, 206 Md.App. 202, 47 A.3d 1051 (2012), this Court went to some length to explain the geographic scope—the range in space— of the Search Incident to Lawful Arrest. The very fact of a lawful arrest, with a warrant or warrantless, conferred on the police the automatic prerogative of conducting a search incident to that arrest. United States v. Robinson, supra. But where between the middle of the arrestee's torso and the planet Venus would that prerogative run out? The scope of the police prerogative had to be broad enough to serve the twin purposes of the exception:

Reasoning from the service of those purposes, it followed, said Frankfurter and ultimately *Chimel*, that <u>the prerogative should not be tied tightly to the body of the arrestee</u>, because the arrestee could reach for a nearby lottery slip and swallow it even if it was not on his body or lunge for a nearby weapon to harm the officer even if the weapon were not on his body. <u>The search perimeter, therefore, had to be pushed out to include a penumbral danger zone. It had to embrace what Frankfurter denominated "that area that may fairly be deemed an extension of the body."</u>

(Emphasis supplied.) 206 Md.App. at 231.

<u>Chimel</u> established unequivocally the now universally established geography—the range in space—of the Search Incident to Lawful Arrest. <u>Feaster</u>, 206 Md.App. 231, described <u>Chimel</u>'s mandate.

Proceeding directly from that logic, *Chimel* <u>described the search incident zone as the area within the "reach, lunge or grasp" of the arrestee. It may also be thought of as the "wingspan" or "wingspread" of the arrestee. More and more these days, we use, as convenient shorthand, the "*Chimel* perimeter."</u> All of these terms mean exactly the same thing. They describe the area in which the arrestee **MIGHT** be able to do either of the two bad things that the search incident exception was designed to prevent him from doing. <u>That danger zone is *per se* the zone within which the police are permitted, nay encouraged, to take all necessary preemptive or preventive measures.</u>

(Emphasis supplied.)

That seemingly simple solution took on an unexpected complexity in <u>New York v. Belton</u>. <u>New York v. Belton</u> posed the problem of how to measure the searchable zone when a Chimel perimeter and the passenger compartment of an automobile overlap. Belton was sitting behind the steering wheel of a car stopped by the police. He was properly arrested. The question that immediately surfaced was that of how to measure the permitted scope of the attendant Search Incident. <u>Feaster</u> described the problem:

<u>The problem was how to measure the permissible scope of a search incident when the arrestee was, as driver or passenger, still sitting in the vehicle or</u>

26

standing just outside the vehicle when the arrest occurred. The Supreme Court recognized the tangled complexities of calibrating someone's reach, lunge, or grasp in and out of a glove compartment, under the front seat, down between the seats, onto the back seat, onto the floor of the rear seat, into the window buckets, etc. Is the back window ledge of a small Volkswagen, for instance, within the wingspan of a driver with long, long arms, but the back window ledge of a big Lincoln town car beyond the wingspread of a driver with short, short arms? If more than one arrestee were in or near the car, moreover, multiple *Chimel* perimeters might overlap.

(Emphasis supplied.) 206 Md.App. at 232-33.

Rather than subjecting trial courts to the infernal complexity of trying to measure a particular arrestee's actual reach, lunge, or grasp against hundreds of subtle factual variables, the Supreme Court cut the Gordian Knot with a "bright-line formula." Feaster described the sweeping solution.

> *New York v. Belton* responded to such potential trivializing with a "bright line formula." As an easily administered and standardized test, the passenger compartment, as an indivisible unit, would either be all in the *Chimel* perimeter or all outside of it. Even if the arrestee were standing outside the car, if his actual *Chimel* perimeter touched any part of the passenger compartment, then the entire passenger compartment would arbitrarily be deemed to be within his *Chimel* perimeter. Even if not always true, it is true most of the time, and that is all that is required to justify a "bright line formula."

(Emphasis supplied.) 206 Md.App. at 233.

The problem in Arizona v. Gant was that the arrestee (and his surrounding Chimel perimeter) was farther removed from the passenger compartment than had been the case in Belton v. New York. The State wanted to extend the activating link between the arrestee's Chimel perimeter and the passenger compartment. The defendant was against any such extension. The first of the twin rationales, an inextricable part of Search Incident law, permitted the search of the passenger compartment as a search incident to lawful arrest

27

"only if the arrestee is within reaching distance of the passenger compartment at the time of the search." 556 U.S. at 351.

New York v. Belton and Arizona v. Gant are thus completely compatible. If, in the words of Arizona v. Gant's first rationale, "the arrestee is within reaching distance of the passenger compartment," the passenger compartment is ipso facto within Chimel's universally recognized "reach, lunge, or grasp" of the arrestee. If the appellant can reach it, it is within his reach. Gant, with its first rationale, in precise terms reaffirmed Belton. But it is the second of Gant's rationales that is being urged upon us in this case.

**The Car Search In This Case**

When the Elantra was searched in this case, the appellant was standing "at least ten feet away" and was, moreover, standing behind a small wall surrounding the carwash bay. We, like the motions court, are not persuaded that the circumstances justified the search under the second Gant rationale. As appellant notes in his brief, and even considering the facts in the light most favorable to the State as the prevailing party, appellant "was arrested as a suspect in an armed carjacking that had occurred 18 days prior to the arrest and at least twenty miles away from the original incident." Although we recognize that handguns have a "continuing utility and value" to their owners, see State v. Ward, 350 Md. 372, 389, 712 A.2d 534 (1998) (concerning a warrant to search Ward's vehicle issued four days after a murder), there was no indication in this record to suggest that appellant was still in possession of the handgun used in the prior carjacking or that it was located within the leased vehicle he was driving on the day he was arrested. As the Court of Appeals has explained, "[t]he ultimate criterion in determining the degree of evaporation of probable

28

cause, however, is not case law but reason." <u>Patterson v. State</u>, 401 Md. 76, 93, 930 A.2d 348 (2007) (quoting <u>Andreson v. State</u>, 24 Md. App. 128, 172, 331 A.2d 78 (1975)). Accordingly, whereas it was not reasonable in that case to speculate that appellant remained armed and in possession of the discrete monetary gains obtained during this prior incident, we concur with the motions court that the warrantless search could not be justified under the special <u>Arizona v. Gant</u> exception in this case.

With respect to the second rationale of <u>Arizona v. Gant</u>, the suppression hearing judge made the following findings, as he ruled that, on the Fourth Amendment merits, the State had failed to show that the warrantless search of the Elantra was reasonable under the special <u>Arizona v. Gant</u> exception to the warrant requirement.

> THE COURT: … <u>The only possible</u>, sort of, <u>grounds under *Gant*</u> you could get to is if there's <u>reasonable articulable suspicion that the vehicle contains evidence related to the nature of the arrest</u>. And, of course, in this case it was an arrest warrant, it wasn't a summary arrest based on conduct under a probable cause analysis. And this Court finds both geographically and temporally, <u>it's too attenuated to apply that prong of *Gant*</u> because, as [the defense] pointed out, the distance from the alleged crime int his case was, I don't know, close to 20 miles away from the car stop. But in addition to that, 18 days had lapsed and <u>there was no indicia of Defendant's behavior</u> that was observed, at least that this Court heard today, <u>that Mr. White had contraband related to that offense</u>.

(Emphasis supplied.) On the merits, the search of the Elantra in this case violated the Fourth Amendment. What, then, shall the sanction be?

Sagely anticipating that all might not go well on the review of the Fourth Amendment merits, to wit, the review of the special <u>Arizona v. Gant</u> exception to the warrant requirement, the State has mounted a double-barreled attack in an attempt to outflank the Fourth Amendment merits on both flanks, both before and after the review of

29

the merits. If the State had prevailed on its claim that the appellant had not satisfied the threshold of Fourth Amendment applicability, to wit, that the appellant lacked standing to object to the search of the borrowed car, the Fourth Amendment merits, whatever they might have been, would have been irrelevant. Our holding on the appellant's standing, however, foreclosed that antecedent attack on the very consideration of the merits. As anticipated, our review of the Fourth Amendment merits then went against the State.

The State then attacked the other flank. That flanking maneuver at the far end of the Fourth Amendment spectrum is now before us. The State reminds us that even if the prosecution is found to have been guilty of a Fourth Amendment violation, the exclusion of the evidence does not automatically follow. The State invokes the Inevitable Discovery exception to the Exclusionary Rule.

## III. The Sanction, If Any, For A Fourth Amendment Violation

Ordinarily, the sanction for a Fourth Amendment violation would be the suppression, via the Exclusionary Rule, of the evidentiary fruit of the violation. That, however, is not always the case. There are instances in which the Supreme Court has decided that the prejudice suffered by the defendant from the violation is non-existent, or, at least, is not so severe as to make appropriate the heavy sanction of suppressing the evidence. These instances of diminished prejudice are categorized as the Exceptions or Exemptions From the Exclusionary Rule. See Maguire, "How To Unpoison The Fruit: The Fourth Amendment and the Exclusionary Rule," 55 J. Crim. L. Criminology and Poli. Sci. 307, 313-21 (1964). There are three such recognized exceptions or exemptions. They are:

### 1. Attenuation of Taint

## 2. Independent Source

## 3. Inevitable Discovery

Although the legal world has been captivated by Professor John Maguire's metaphor of "unpoisoning the fruit of the poisonous tree," in actuality in one instance (Attenuation of Taint) the fruit is only mildly poisoned and in the other two instances (Independent Source and Inevitable Discovery) the fruit is determined not to have been poisoned at all.

The Attenuation of Taint exception recognizes that even granting a Fourth Amendment violation, sometimes the causal connection between the violation and the ultimate recovery of the evidence is so attenuated by time and space and intervening circumstances that the exclusion of evidence is too high a price to pay for a violation that only modestly contributed to the recovery of the evidence. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). An excellent and thorough discussion of the Attenuation of Taint Exception is that of Judge Battaglia for the Court of Appeals in Miles v. State, 365 Md. 488, 516-29, 781 A.2d 787 (2001).

The Independent Source exception recognizes the circumstance where the Fourth Amendment violation, albeit unquestionably having occurred, turns out to be redundant. Notwithstanding the Fourth Amendment violation, the police had already obtained the incriminating information from an independent source, completely free of any unconstitutional taint. Segura v. United States, 468 U.S. 796, 104 S.Ct. 380, 82 L.Ed.2d

599 (1984); <u>Murray v. United States</u>, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

## Inevitable Discovery

The third of the exceptions to the application of the Exclusionary Rule, and that invoked by the State in this case, is Inevitable Discovery. Maryland, along with the national caselaw generally, had recognized the principle of Inevitable Discovery well before the Supreme Court put its official imprimatur on the phenomenon in 1984. In <u>Stokes v. State</u>, 289 Md. 155, 423 A.2d 552 (1980), Judge Digges's opinion posed the question before the Court of Appeals:

> [T]he State asks us to <u>recognize</u> and apply in Maryland <u>what has been denominated elsewhere to be the inevitable discovery doctrine</u>. This doctrine, which has gained increasing acceptance throughout the jurisprudential law of this nation, recognizes an exception to the traditional rule excluding from use at trial illegally gathered evidence or its poisoned "fruits."

(Emphasis supplied.) 289 Md. at 162.

The Court of Appeals in <u>Stokes</u> adopted the Inevitable Discovery Doctrine, describing it in the following terms:

> This exception permits the government to cleanse the fruit of poison by <u>demonstrating that the evidence acquired through improper exploitation would have been discovered by law enforcement officials by utilization of legal means independent of the improper method employed</u>.

(Emphasis supplied.) 289 Md. at 163.

Quoting from LaCount and Girese, "The 'Inevitable Discovery' Rule, an Evolving Exception to the Constitutional Exclusionary Rule," 40 Alb. L.Rev. 483, 491 (1976), the Court of Appeals spelled out the requirements for the invocation of the doctrine.

> [T]he prosecution must establish, first, <u>that certain proper and predictable investigatory procedures would have been utilized in the case at bar</u>, and second, <u>that those procedures would have inevitably resulted in the discovery of the evidence in question</u>.

(Emphasis supplied.) 289 Md. at 163.

The Supreme Court applied its seal of approval in 1984 with its decision in <u>Nix v. Williams</u>, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Chief Justice Burger's opinion explained why the Inevitable Discovery Exception makes eminently good sense.

> <u>[I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury</u> in order to ensure the fairness of the trial proceedings. In that situation, the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a worse position than it would have occupied without any police misconduct.

(Emphasis supplied.) 467 U.S. at 447.

In the years following <u>Nix v. Williams</u>, the Court of Appeals applied the Inevitable Discovery Doctrine twice, now authoritatively binding as the law of the land, in <u>Oken v. State</u>, 327 Md. 628, 654-56, 612 A.2d 258 (1992) and the definitive analysis by Judge Raker in <u>Williams v. State</u>, 372 Md. 386, 409-428, 813 A.2d 231 (2002). In addition to her exhaustive covering of the waterfront in all other regards, Judge Raker pointed out the close philosophical relationship between the Inevitable Discovery Doctrine and the Independent Source Doctrine.

> <u>There is a close kinship between inevitable discovery and independent source but although they are closely related, they are analytically distinct</u>. … The two doctrines differ in that "<u>under the independent source doctrine, evidence that was *in fact* discovered lawfully</u>, and not as a direct or indirect result of illegal activity, is admissible." <u>Under the inevitable discovery doctrine,</u>

33

evidence is admissible that *inevitably would have been* discovered through lawful means even though the means that led to its discovery were unlawful.

(Emphasis supplied.) 372 Md. at 410-11.

In a grammatical sense, Inevitable Discovery is Independent Source in the subjunctive mode. Independent Source narrates what actually happened in the real world in the indicative mode. Inevitable Discovery engages, in the subjunctive mode, in informed speculation about what would have happened if the violation had never occurred. Subjunctive inevitability pinch-hits for indicative actuality. In a familiar Hollywood technique, time (the narration) stops at the moment the Fourth Amendment violation takes place but then rolls forward again as we now engage in an imaginary sequence and hypothesize about what inevitably would have happened in an alternative universe where the unreasonable search had not preempted the inevitable likelihood of a reasonable inventory search.[5] We substitute what inevitably would have happened for what actually did happen.

## Inevitable Discovery In This Case

The Inevitable Discovery scenario urged by the State in this case is that at the time of the appellant's arrest, the Elantra was blocking the flow of business at the car wash and had to be removed from that position. The State argues that inevitably the car would have been towed to the police impounding lot and that the routine inventory search of the contents of the Elantra before it was towed would have revealed the handgun sitting in the

---

[5]    In the immortal words of Yogi Berra: "It's hard to make predictions --  especially about the future."

34

front seat of the car. At the suppression hearing, the State posed its argument with respect to Inevitable Discovery.

> Lastly, I'll go to the inevitable discovery. Because of the status of the car being a leased vehicle that's a day after it was due, not leased to the Defendant, there's no evidence that he was even authorized to drive it, the officers in that case had the ability to then tow the vehicle. There was nobody immediately available to come get it that they knew of, and <u>I believe because of the background research that they did on the vehicle, knowing that it was leased, knowing that it was expired, they intended to tow the vehicle, which would have inevitably led them to have to do an inventory search to protect themselves and whoever took the vehicle from any valuables, and this gun was in a location which would have naturally been searched in an inventory search</u>, that being on the passenger seat, and they would have found the gun that way, Your Honor.

(Emphasis supplied.)

Our inquiry is into whether that posited scenario was, indeed, inevitable. Our conclusion is that it was not. The primary problem with the State's Inevitable Discovery argument in this case is that it takes too much for granted. Inevitable Discovery may not be taken for granted. It is not the norm. It is most definitely an exception to the norm. The burden of proof is cast upon the State to prove its entitlement to the Inevitable Discovery exception. This presupposes some discussion of and serious consideration of the various factors that enter into such an exception. In this case, the discussion of and the consideration of the factors involved was exceedingly skimpy. The entirety of the evidence about towing the Elantra was as follows:

> THE STATE: Okay. And <u>what</u>, if anything, <u>was your plans for this vehicle</u>?
>
> OFFICER: At that point, being where it was, we would try to verify a couple things, but at that point, it was – <u>it</u> was going to be – <u>have to be removed from that car wash bay because we were blocking business for this carwash</u>.

THE STATE: do you know whether or not you were planning on towing it?

THE DEFENSE: Objection.

THE COURT: Overruled.

OFFICER: Once we verified a couple of things and realized that the vehicle was supposed to be returned the day before, we – a tow was inevitable, correct.

THE STATE: So it was a leased vehicle?

OFFICER: Yes, sir.

THE STATE: It was a day late?

OFFICER: Yes, sir.

THE STATE: And your plan was to tow it?

OFFICER: Yes, sir.

(Emphasis supplied.)

The entirety of what was said about an inventory search was as follows:

THE STATE: What are your procedures when you tow a vehicle?

THE DEFENSE: Objection

THE COURT: Yeah. Relevance now?

THE STATE: Your Honor, it is partially my argument that this leads to basically an inevitable discovery argument based on an inventory search, based on they were going to tow the vehicle anyway.

THE COURT: All right. Overruled.

OFFICER: So the procedure for the tow is that we inventory any valuables. So we would look through, pretty much, the entire vehicle just to make sure that nothing of value needed to be reported, and to just list the items on the actual Tow Inventory Report.

36

(Emphasis supplied.)

That was the entirety of the case for Inevitable Discovery. Without suggesting that anything said there was wrong, we find that what was said was exceedingly skimpy and was exceedingly conclusory. It was as if the mere mention of "towing the car" was an "Open, Sesame" proclaiming all that need be said about what can be a complicated and nuanced community caretaking function. The burden of proof contemplates more than intoning some magic words. The notion, however, seems to have arisen that once an officer testifies that he intends to tow the car, the entire Inevitable Discovery Doctrine falls automatically into place. It doesn't. On the road to Inevitable Discovery, the State's burden of proof involves more than negotiating a barely discernible speed bump. An intent to tow the car is not a shibboleth.

In reviewing a claim of Inevitable Discovery, the key issue is the inevitability factor. The key procedural factor is that the burden of proof is on the State to establish inevitability, not upon the defendant to disprove it. A scenario wherein very little is said one way or the other by either party argues strongly against the State.

One event that must be shown to have been inevitable is that the Elantra would have been impounded and towed away by the Anne Arundel County Police Department. We are not persuaded by the State that such an action in this case was inevitable. The Elantra, to be sure, had to be removed from the premises of the carwash because it was blocking the ongoing flow of business. Why the car could not have been conveniently parked on the adjoining street was never mentioned or discussed. If a police regulation forbade such an action, no mention of such a regulation is to be found in the transcript. Nor is it something

37

of which the court would take judicial notice. In this case, the police did indicate that if the appellant had been the owner or rightful possessor of the car, he would have been given the opportunity to call a relative or a friend who could pick up the car for him and thereby obviate any need for the car to be towed. Why did not the police make a quick telephone call and extend a similar option to Roxanne Douglas who had leased the car and loaned it to the appellant? There may have been good reason not to do so, including the fact that the rental agreement was already a day overdue, but a serious consideration of Inevitable Discovery would at least have mentioned the subject and at least have raised an inquiry, but there was no mention of such a possibility.

In terms of a feasible alternative to the police impoundment of the vehicle, an obvious and prominent alternative would have been the "All Car Leasing" car rental agency itself. It would have been very easy to make telephone contact with and it would have sent an employee immediately to pick up a very valuable asset such as the Elantra. How far away from the arrest scene in Glen Burnie was the Anne Arundel County Police impounding lot? How far away was the car rental agency? None of these seemingly obvious issues were even remotely alluded to at the suppression hearing. On review, it seems to us counterintuitive that the police would opt to call a tow truck and to haul the Elantra to a possibly far distant impounding lot when a simple phone call would more quickly and more conveniently have released the police of a presumably unwanted community caretaking responsibility. Why then would the counterintuitive thing, rather than the intuitive thing, have been inevitable? If there was some department rule or

regulation governing the police procedure in a case such as this, no such rule or regulation was introduced into evidence nor ever mentioned.[6]

Quite aside from the inevitability of the impoundment, there is an additional inevitability issue of equal, if not greater, significance. It is the ultimate inventory search itself and the attendant preparation of an inventory list. If, in the case of a car towing, such inventorying is an established procedure, such a procedure does not speak for itself. The record was silent, and that silence works to the disadvantage of the State.

The purpose of the inventory search of an impounded automobile, of course, is not to recover evidence of a crime, but only to list any items of value in the car and to serve a copy of said inventory list on the owner or rightful possessor of the vehicle. For whose benefit would such an inventory have been prepared in this case? For the appellant? Hardly. How about Roxanne Douglas who had loaned the car to the appellant? Would she be excluded from receiving a copy of the inventory because the lease had expired? How about the All Car Leasing company that actually owned the car? Perhaps not because rental

---

[6] This discussion is not intended to establish an absolute rule of any sort. When dealing with a well established automobile rental agency such as Hertz or Avis and when the agency is in close proximity and when the possible contact is in the working day, the feasibility of an alternative to impoundment might well tilt in one direction. When dealing with a smaller or more obscure rental agency, on the other hand, located at a greater distance and during non-business hours, the feasibility of contacting it might point in an alternative direction. In any event, it is but a factor in assessing whether the police are engaged in a genuine community caretaking obligation or are simply invoking impoundment as an excuse for an investigatory search of the vehicle. It is not a dispositive fact, but it is a factor. The feasibility or non-feasibility of this alternative, however, is a subject at least worthy of consideration and it should not blithely be dismissed. One would at least expect the subject to arise in the course of the larger conversation.

agencies do not routinely leave their valuable chattels in a car that is being rented to a customer. In a situation, of course, where no one would be entitled to an inventory list, there would be no purpose in conducting an inventory search. If it served no purpose, why would it be inevitable? More significantly, how could there be a serious consideration of Inevitable Discovery in this case without such questions even arising?

The answer would appear to be that there was no serious consideration of the Inevitable Discovery question in this case. In reviewing an Inevitable Discovery decision, one gets a feel for the general tone and tenor of the surrounding discussion. In this case, the several very skimpy questions about towing that were asked and answered were not in a context of what inevitably was going to be done with the car or what inevitably was going to be done about an inventory search. They were asked and answered in the patent context of what magic words need to be said in order to qualify for an exemption from the Exclusionary Rule. That reduces Inevitable Discovery to a robotic charade.

One final word about the analysis of inevitability. What ultimately actually happens, in the indicative mode, throws incisive light on what might earlier have appeared to be inevitable, in the subjunctive mode. In this case, the Elantra was never towed -- at least as far as this record reflects. In this case, no inventory search was ever made and no inventory list was ever supplied to anyone -- at least as far as this record reflects. Whether the automobile impoundment ultimately does or does not happen is a stern reality check on its earlier ostensible inevitability. Once the towing event or non-event ripens into historic fact, one need no longer rely on a prediction. We beg to ask, "If the towing was inevitable, why did it not happen?" We beg to ask, "If it did happen, why was the court not told about it?"

The bottom line of Inevitable Discovery is that it can't be blithely taken for granted. Considered in its totality, the State did not prove a case of Inevitable Discovery.

Ponder for a moment this brief question-and-answer exchange:

PROSECUTOR: After you searched the car and then arrested the defendant, Officer, would not you and the other police be responsible for towing the car away?

OFFICER: We surely would. We don't have any control over that.

If that essentially is all that it takes, it would seem that every fruitful automobile search followed by the arrest of the driver could, once the police have learned the drill, become eligible for immunity from the Exclusionary Rule by way of Inevitable Discovery. It is hard to believe that Nix v. Williams, which dealt with an infinitely more complicated factual scenario than this, intended to be so casually profligate with an exception to the Exclusionary Rule.

### "When The Hurly Burly's Done"[7]

On this appeal, the appellant, notwithstanding his laconic original contention, has truly covered the entire Fourth Amendment universe. To the three bedrock questions he has posed, we supply the following answers.

### I. WAS THE FOURTH AMENDMENT APPLICABLE?

Yes. The appellant, relying heavily on Byrd v. United States, adequately established that he enjoyed Standing to Object to the search of the borrowed car he was driving when stopped. We, therefore, go on to the merits.

---

[7]     Shakespeare, Macbeth, Act 1, Scene 1.

**II. WAS THE FOURTH AMENDMENT SATISFIED ON ITS MERITS?**

No. The warrantless search of the car did not qualify for the special Arizona v. Gant exception to the warrant requirement. Presumably, the Exclusionary Rule will be the sanction.

**III. DID THE STATE QUALIFY FOR THE INEVITABLE DISCOVERY EXEMPTION FROM THE SANCTION OF THE EXCLUSIONARY RULE?**

No. The State failed to prove that either the towing of the automobile or an inventory search of the automobile was inevitable.

**JUDGMENT REVERSED; COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.**

# APPENDIX:

Organizing the Fourth Amendment

## THE FOURTH AMENDMENT

### I. FOURTH AMENDMENT APPLICABILITY

A. Coverage of the Place
B. Coverage of the Searcher (State Action)
C. Coverage of the Defendant (Standing to Object)
    1. Proprietary Standing
    2. Derivative Standing
D. Coverage of Police Behavior: Was it a Search? Was it a Seizure?
    1. Community Caretaking Functions
E. A General Statement: <u>Katz v. United States</u> and the Reasonable Expectation of Privacy

### II. FOURTH AMENDMENT MERITS

A. Warrant Requirement
    1. Probable Cause
    2. Particularity of Description
B. Exceptions to the Warrant Requirement
    1. Search Incident to Lawful Arrest
    2. <u>Carroll</u> Doctrine or Automobile Exception
    3. Exigent Circumstances
    4. Stop and Frisk
    5. Plain View Doctrine
    6. Consent
    7. Special <u>Arizona v. Gant</u> Exception
C. Good Faith Exception: If the Officer is Reasonable, There is No Violation

### III. SANCTION FOR A FOURTH AMENDMENT VIOLATION

A. Exclusionary Rule
B. Derivative Evidence
C. Exceptions to the Exclusionary Rule
    1. Attenuation of Taint
    2. Independent Source
    3. Inevitable Discovery